1  RONALD RUS, #67369
   rrus@rusmiliband.com
2  JOEL S. MILIBAND, #77438
   jmiliband@rusmiliband.com
3  M. PETER CRINELLA, #145157
   pcrinella@rusmiliband.com
4  RUS, MILIBAND & SMITH
   A Professional Corporation
5  Seventh Floor
   2211 Michelson Drive
6  Irvine, California 92612
7  Telephone:   (949) 752-7100
   Facsimile:    (949) 252-1514
8

9  Attorneys for Plaintiff
   MICHAEL R. DANZI
10

11              UNITED STATES DISTRICT COURT

12      CENTRAL DISTRICT OF CALIFORNIA, SOUTHERN DIVISION

13

14  MICHAEL R. DANZI, an individual, )    SA CV 09-0039 CJC (RNBx)

15              Plaintiff,           )    **COMPLAINT FOR:**

16  vs.                             )    **(1)  BREACH OF FIDUCIARY**
                                     )    **      DUTY**
17  HIGHLAND CAPITAL              )    **(2)  AIDING AND ABETTING**
18  MANAGEMENT, L.P., a Delaware )    **      BREACH OF FIDUCIARY**
    limited partnership;            )    **      DUTY.**
19  HIGHLAND CRUSADER            )
    PARTNERS, L.P., a Bermuda limited)
20  partnership;                    )    **DEMAND FOR JURY TRIAL**
    HIGHLAND CREDIT              )
21  STRATEGIES, L.P., a Bermuda  )
    limited partnership;            )
22  NEXBANK, SSB, a Texas chartered )
23  savings bank,                   )
                                     )
24              Defendants.          )
                                     )
25  _____)

26

27

28

Plaintiff Michael R. Danzi ("Plaintiff") alleges as follows:

## THE PARTIES

1.     Plaintiff is, and at all times mentioned herein was, an individual residing in the County of Orange, State of California.

2.     Plaintiff is informed and believes and on that basis alleges that Defendant Highland Capital Management, L.P., ("Highland Capital") is, and at all times relevant to this action was, a limited partnership organized and existing under the laws of the state of Delaware, with its principal place of business in the City of Dallas, State of Texas.

3.     Plaintiff is informed and believes and thereon alleges that Defendant Highland Crusader Offshore Partners, L.P. ("Crusader") is, and at all times relevant to this action was, a Bermuda limited partnership, with its principal place of business in the City of Dallas, State of Texas.

4.     Plaintiff is informed and believes and thereon alleges that Defendant Highland Credit Strategies Master Fund, L.P. ("Credit Strategies") is, and at all times relevant to this action was, a Bermuda limited partnership, with its principal place of business in the City of Dallas, State of Texas.  Defendants Crusader, and Credit Strategies are hereafter referred to collectively as the "Highland Members."

5.     Plaintiff is informed and believes and thereon alleges that Defendant NexBank, SSB ("NexBank") is, and at all times relevant to this action was, a savings bank chartered under the laws of the State of Texas, with its principal place of business in the City of Dallas, State of Texas.  Plaintiff is further informed and believes and based thereon alleges that NexBank is owned and controlled by the same individuals and entities that own and control Highland Capital.

6.     Plaintiff is informed and believes and on that basis alleges that each Defendant named herein aided and abetted, and rendered substantial

1 assistance in the wrongful conduct complained of herein. In taking action to aid
2 and abet, and substantially assist in doing the things hereinafter alleged, Plaintiff
3 is informed and believes and thereon alleges that each Defendant acted with
4 knowledge of the wrongdoing as herein alleged.

5 **JURISDICTION AND VENUE**

6       7.     This Court has jurisdiction over the subject matter of this
7 action under 28 U.S.C. § 1332. Plaintiff is a citizen of the State of California,
8 Defendants are citizens of the States of Delaware and Texas, and the Country of
9 Bermuda, and the amount in controversy exceeds $75,000, exclusive of interest
10 and costs. The citizenship of the named Defendants is as follows:

11           &bull;    Defendant Highland Capital limited partnership
12 organized under the laws of the State of Delaware and having its principal place
13 of business in the State of Texas. The general partner of Highland Capital is
14 Strand Advisors, Inc., a corporation incorporated under the laws of the State of
15 Delaware and having its principal place of business in the State of Texas.

16           &bull;    Defendant Crusader is a limited partnership organized
17 under the laws of the State of Delaware and having its principal place of business
18 in the State of Texas. The general partner of Crusader is Highland Crusader
19 Fund GP, L.P., a limited partnership organized under the laws of the State of
20 Delaware and having its principal place of business in the State of Texas.

21           &bull;    Defendant Credit Strategies is a limited partnership
22 organized under the laws of the State of Delaware and having its principal place
23 of business in the State of Texas. The general partner of Credit Strategies is
24 Highland General Partner, L.P., a limited partnership organized under the laws
25 of the State of Delaware and having its principal place of business in the State of
26 Texas.

27           &bull;    Defendant NexBank is a Texas chartered savings bank
28 having its principal place of business in the State of Texas.

1           8.    Venue is proper in this Judicial District under 28 U.S.C.

2    § 1391(b) and (c).

3    **GENERAL ALLEGATIONS**

4           9.    On or about June 22, 2007, Crusader and Credit Strategies

5    and Plaintiff entered into the Limited Liability Company Operating Agreement of

6    Legacy Pharmaceuticals International, LLC (the "Operating Agreement") for the

7    purpose of forming Legacy Pharmaceuticals International, LLC ("Legacy

8    Pharmaceuticals").  A true and correct copy of the Operating Agreement is

9    attached as Exhibit "1" and incorporated herein by reference.  Legacy

10   Pharmaceuticals owns and controls a variety of subsidiary companies including

11   Legacy Pharmaceuticals U.S. Inc. which maintains its corporate offices in

12   Orange County, California.

13         10.    Legacy Pharmaceuticals was formed in connection with and

14   for the acquisition of the businesses and assets of two pharmaceutical

15   manufacturing plants owned by Valeant Pharmaceuticals International, Inc.

16   ("Valeant").  Such acquisition was consummated through Legacy's wholly-owned

17   subsidiaries Legacy Pharmaceuticals International, GmbH ("Legacy GmbH") and

18   Solco Pharmaceuticals Switzerland GmbH ("Solco").  Legacy Pharmaceuticals,

19   Legacy GmbH, and Solco are hereafter referred to collectively as "Legacy."

20         11.    Pursuant to Schedule I and II of the Operating Agreement,

21   Crusader, Credit Strategies, and Plaintiff were each "Members" of Legacy

22   Pharmaceuticals.

23         12.    Terms of the operation and management of Legacy

24   Pharmaceuticals were set forth in Article V of the Operating Agreement

25   including, *inter alia*, the right of Plaintiff and the Highland Members to each

26   appoint a Manager to the Management Committee of Legacy.

27         13.    On June 22, 2007, Legacy Pharmaceuticals, Legacy GmbH,

28   and Highland Financial Corp., an affiliate of the Highland Defendants

1  ("Highland Financial"), and NexBank entered into a Credit Agreement ("Credit

2  Agreement").  Pursuant to the Credit Agreement, Highland Financial agreed and

3  obligated itself, as lender, to extend certain credit facilities to Legacy GmbH, in

4  an aggregate amount not to exceed $43,000,000, consisting of $38,000,000

5  aggregate principal amount of Term Loans (the "Term Loans") up to $5,000,000

6  aggregate principal amount of Revolving Commitments (the "Revolving Loans"),

7  the proceeds of which were to be used to fund the acquisition of the businesses

8  and assets of Valeant and for working capital, to finance capital expenditures,

9  and for general corporate purposes.  A true and correct copy of the Credit

10  Agreement (without Schedules and Exhibits) is attached as Exhibit "2."

11           14.    Pursuant to Section 2.13 of the Credit Agreement, upon

12  receipt by Legacy GmbH of any Net Asset Sales Proceeds (as defined in the

13  Credit Agreement) in excess of $250,000, Legacy GmbH was required to prepay

14  the Term Loans in an amount equal to such Net Asset Sale Proceeds provided:

15           so long as no Default or Event of Default shall have
          occurred and be continuing, upon delivery of a written
16           notice to Administrative Agent, Company shall have the
          option, directly or through one or more Subsidiaries, to
17           invest the Net Asset Sale Proceeds (the "Asset Sale
          Reinvestment Amounts") in (i) long-term productive
18           assets of the general type used in the business of
          Company if such assets are purchased or constructed
19           within 180 days following receipt of the Net Asset Sale
          Proceeds (and so long as any such individual or
20           aggregate investment in the amount of $250,000 or
          more has been consented to by Administrative Agent
21           and Requisite Lenders), or (ii) Permitted Acquisitions if
          (x) a definitive purchase agreement with respect to such
22           Permitted Acquisitions is executed within 120 days
          following receipt of such Net Assets [Sale] Proceeds and
23           (y) the transaction contemplated by such purchase
          agreement is consummated within 180 days of receipt
24           thereof; ...

25           15.    In June 2008, at a time when no default or event of default had

26  occurred under the Credit Agreement, Legacy sold a building adjacent to its

27  Switzerland manufacturing plant ("Building 11") for approximately $2.3 million.

28  The $2.3 million realized by Legacy on the sale of the building constituted Net

Asset Sales Proceeds under the terms of the Credit Agreement. In accordance with Section 2.13 of the Credit Agreement, Legacy notified NexBank that it intended to reinvest the Net Asset Sales Proceeds in a permitted transaction.

16.   On June 19, 2008, NexBank acknowledged to Legacy that written notice regarding the Net Asset Sale Proceeds had been submitted to NexBank by Legacy, and that reinvestment of the Net Asset Sales Proceeds was a permitted transaction under the terms of the Credit Agreement.

17.   On September 7, 2008, Plaintiff, in his capacity as a Manager of Legacy, notified Highland and the Highland Members that Legacy had reached an agreement to acquire the US product rights to four generic products from Par Pharmaceuticals for $700,000 (the "Par Acquisition"), and that the total cost of the Par Acquisition would be $2.6 million for purchase, marketing, and working capital. Plaintiff also requested that the Highland Manager, Patrick Daugherty ("Daugherty"), execute a Joint Action by Written Consent of the Managing Committee of Legacy Pharmaceuticals International, LLC ("Joint Action") approving the Par Acquisition.

18.   On September 9, 2008, Daugherty, in his capacity as the Highland Manager, agreed to and executed the Joint Action approving the Par Acquisition.

19.   On September 11, 2008, Legacy notified NexBank that pursuant to Section 2.13(a) of the Credit Agreement it had elected to reinvest the approximately $2.3 million in proceeds realized on the sale of Building 11 to complete the Par Acquisition, and that the total investment in the Par Acquisition of $2.6 million was approved by the Management Committee of Legacy.

20.   On October 22, 2008, Legacy sent NexBank a funding notice to draw down on the Revolving Loans (the "Funding Notice") to which Legacy was entitled in accordance with Section 2.2(b) of the Credit Agreement. That same day, NexBank acknowledged to Legacy that it had received the Funding

1  Notice and confirmed that it would disburse the Revolving Loans proceeds

2  "shortly."

3      21.    On October 23, 2008, Highland Capital and the Highland

4  Members instructed NexBank to disregard the Funding Notice and refuse to allow

5  Legacy to draw down on the Revolving Loans.

6      22.    On October 24, 2008, in contravention of its confirmation of

7  its obligation to comply with the Funding Notice, NexBank advised Legacy that it

8  would not comply with the Funding Notice and would not disburse the Revolving

9  Loans proceeds.

10      23.    Also on October 24, 2008, NexBank sent Legacy an e-mail

11  communication stating:

12      [NexBank], at the direction of the Required Lenders, is
       requesting that the approximate net sales proceeds of
13      $2,375.000 from the sale of Building 11 be forwarded to
       [NexBank] and applied as a pre-payment under Section
14      6.9 (h) and section 2.14 of the Credit Agreement.

15      24.    On October 27, 2008, Legacy sent a letter to NexBank

16  advising that it had received prior written confirmation from NexBank that the

17  $2.3 million of proceeds from the sale of Building 11 were to be utilized by

18  Legacy for future reinvestment in accordance with the Credit Agreement and that

19  Legacy had provided NexBank with adequate notice of the transaction in which

20  the proceeds were to be applied (*i.e.*, the Par Acquisition).  Legacy also

21  informed NexBank that with the Par Acquisition fully completed based on the

22  prior agreement of NexBank, it was too late for Legacy to instead transfer the

23  proceeds of Building 11 to NexBank.

24      25.    On November 21, 2008, NexBank sent a letter to Legacy

25  stating:

26      NexBank, as Administrative Agent ("Agent"), ***has had***
       ***further conversations with Highland Capital***
27      ***Management, LP ("Highland")*** concerning the
       intended use of the $2,231,683.85 of proceeds from the
28      sale of building 11 on June 20, 2008 and is in agreement

that such proceeds may be retained by Legacy Pharmaceuticals International GmbH ("Company") for future reinvestment by the Company in accordance with Section 2.13(a) of the Credit Agreement. *Agent and Highland further agree* that Company has 180 days or until December 17, 2008 to re-invest such sales proceeds in accordance with Section 2.13(a).

... *Agent and Highland are in agreement* that the $700,000 being paid to Par for the aNDAs does qualify under Section 2.13(a)(i) long-term productive asset and that such asset was purchased in the allowed 180 day time frame. ... *Agent and Highland do not believe* that the remaining $1,621,683.85 can be used towards the $1.9 million additional investment as the items described in the $1.9 million additional investment do not qualify under Section 2.13(a) as long-term productive assets. (Emphasis added.)

26.    Plaintiff is informed and believes and on that basis alleges that Highland Capital and the Highland Members instructed NexBank to disregard its commitment to Legacy with regard to the application of the proceeds of the sale of Building 11.

## FIRST CLAIM FOR RELIEF

### (Breach of Fiduciary Duty Against

### Defendants Crusader and Credit Strategies)

27.    Plaintiff repeats and incorporates by reference the allegations contained in paragraphs 1 through 26 above, as though set forth in full hereat.

28.    By virtue of their capacity as members of Legacy Pharmaceuticals, the Highland Members owed to Plaintiff a fiduciary duty of the highest good faith, integrity, and fair dealing.

29.    Plaintiff is informed and believes and based thereon alleges that all times relevant the Highland Members knew that they owed fiduciary duties to Plaintiff, and that their conduct as described above constituted a breach of those duties.  Notwithstanding this knowledge, the Highland Members engaged in the wrongful and improper conduct alleged herein.

/ / /

1       30.    The Highland Members breached their fiduciary duties to

2 Plaintiff in doing the things alleged herein including, *inter alia,* instructing

3 NexBank to repudiate its obligation to comply with the Funding Notice and refuse

4 the rightful request of Legacy to draw down on the Revolving Loans; and by

5 instructing NexBank to disregard its prior agreement and commitment to Legacy

6 for application of the proceeds of the sale of Building 11 to the Par Acquisition in

7 accordance with the terms of the Credit Agreement.

8       31.    In doing the acts alleged, the Highland Members failed to

9 exercise the care owed by a fiduciary, and violated their fiduciary duties to

10 Plaintiff.

11       32.    As a proximate result of the wrongful conduct of the Highland

12 Members as alleged, Plaintiff has suffered damages in an amount in excess of

13 $75,000, with the exact amount according to proof at trial.

14       33.    In doing the acts alleged, the Highland Members acted with

15 oppression, fraud, and malice and in a conscious disregard of the rights of

16 Plaintiff, and Plaintiff is therefore entitled to an award of punitive damages in an

17 amount sufficient to punish and make an example of said Defendants.

18                    **SECOND CLAIM FOR RELIEF**

19           **(Aiding And Abetting Breach of Fiduciary Duty**

20              **Against Defendant Highland Capital)**

21       34.    Plaintiff repeats and incorporates by reference the allegations

22 contained in paragraphs 1 through 33 above, as though set forth in full here.

23       35.    Plaintiff is informed and believes and based thereon alleges

24 that at all times relevant Defendant Highland Capital knew that the Highland

25 Members owed fiduciary duties to Plaintiff and knew that in taking the actions

26 and performing the acts as herein alleged, the Highland Members were in breach

27 of their fiduciary duties to Plaintiff.

28 / / /

1   36.   Plaintiff is informed and believes and based thereon alleges

2   that Defendant Highland Capital knowingly aided and abetted the Highland

3   Members' breach of fiduciary duty by, *inter alia*, instructing NexBank to

4   repudiate its obligation to comply with the Funding Notice and refuse the rightful

5   request of Legacy to draw down on the Revolving Loans; and by instructing

6   NexBank to disregard its prior agreement and commitment to Legacy for

7   application of the proceeds of the sale of Building 11 to the Par Acquisition in

8   accordance with the terms of the Credit Agreement.

9   37.   In taking such action as alleged, Defendant Highland Capital

10  acted with knowledge of the primary wrongdoing herein alleged and rendered

11  substantial assistance to the accomplishment of the wrongful conduct.

12  38.   As a proximate result of the wrongful conduct of Defendant

13  Highland Capital, Plaintiff has suffered damages in an amount in excess of

14  $75,000, with the exact amount according to proof at trial.

15  39.   In doing the acts alleged, Defendant Highland Capital acted

16  with oppression, fraud, and malice and in a conscious disregard of the rights of

17  Plaintiff, and Plaintiff is therefore entitled to an award of punitive damages in an

18  amount sufficient to punish and make an example of Highland Capital.

19  **THIRD CLAIM FOR RELIEF**

20  **(Aiding And Abetting Breach of Fiduciary Duty**

21  **Against Defendant NexBank)**

22  40.   Plaintiff repeats and incorporates by reference the allegations

23  contained in paragraphs 1 through 33 above, as though set forth in full here.

24  41.   Plaintiff is informed and believes and based thereon alleges

25  that at all times relevant Defendant NexBank knew that the Highland Members

26  owed fiduciary duties to Plaintiff and knew that in taking the actions and

27  performing the acts as herein alleged, the Highland Members were in breach of

28  their fiduciary duties to Plaintiff.

1    42.    Plaintiff is informed and believes and based thereon alleges
2  that Defendant NexBank aided and abetted the Highland Members' breach of
3  fiduciary duty by, *inter alia*, disregarding the Funding Notice and refusing to
4  allow Legacy to draw down on the Revolving Loans; and repudiating its prior
5  agreement and commitment to Legacy for application of the proceeds of the sale
6  of Building 11 for application of the proceeds of the sale of Building 11 to the
7  Par Acquisition in accordance with the terms of the Credit Agreement.
8    43.    In taking such action as alleged, Defendant NexBank acted
9  with knowledge of the primary wrongdoing, and rendered substantial assistance
10  to the accomplishment of the wrongful conduct.
11    44.    As a proximate result of the wrongful conduct of Defendant
12  NexBank as alleged above, Plaintiff has suffered damages in an amount in excess
13  of $75,000, with the exact amount according to proof at trial.
14    45.    In doing the acts alleged, Defendant NexBank acted with
15  oppression, fraud, and malice and in a conscious disregard of the rights of
16  Plaintiff, and Plaintiff is therefore entitled to an award of punitive damages in an
17  amount sufficient to punish and make an example of NexBank.

18                              **PRAYER FOR RELIEF**
19    WHEREFORE, Plaintiff prays for judgment as follows:
20    1.    For general damages according to proof;
21    2.    For special damages according to proof;
22    3.    For punitive or exemplary damages, according to proof, in a
23        sum sufficient to punish and make an example of Defendants;
24    4.    For reasonable attorneys' fees;
25  / / /
26  / / /
27  / / /
28  / / /

354740v1 ts 1/8/09 4 (2827-0001)                -11-

1       5.      For costs of suit incurred; and

2       6.      For such other relief as the Court deems just and proper.

3

4   DATED: January 8, 2009              RUS, MILIBAND & SMITH
                                        A Professional Corporation
5

6

7                                       By:_____
                                           RONALD RUS
8                                          Attorneys for Plaintiff
                                           MICHAEL R. DANZI

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## DEMAND FOR JURY TRIAL

2          Plaintiff hereby demands trial by jury.

3

4     DATED:  January 8, 2009          RUS, MILIBAND & SMITH
                                       A Professional Corporation
5

6

7                                      By:_____
                                          RONALD RUS
8                                         Attorneys for Plaintiff
                                          MICHAEL R. DANZI
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# Exhibit 1

# LIMITED LIABILITY COMPANY OPERATING AGREEMENT
## OF
## LEGACY PHARMACEUTICALS INTERNATIONAL, LLC

This OPERATING AGREEMENT is entered into and shall be effective as of June 22, 2007 (the "Effective Date"), by and among Highland Crusader Offshore Partners, L.P., a Bermuda limited partnership ("Crusader"), Highland Credit Strategies Master Fund, L.P., a Bermuda limited partnership ("Credit Strategies" and together with Crusader, "Highland") and Michael R. Danzi, an individual and citizen of the United States of America ("Danzi" and together with Highland, the "Original Members") pursuant to the provisions of the Act, on the following terms and conditions:

WHEREAS, the Company's wholly-owned subsidiary Legacy Pharmaceuticals International GmbH, as buyer, and Valeant Singapore Pte Ltd., as seller, entered into a Securities Purchase Agreement dated as of June 1, 2007 (the "Securities Purchase Agreement"), and the Company's indirect wholly-owned subsidiary, Solco Pharmaceuticals Switzerland GmbH, as buyer, and Valeant Pharmaceuticals Switzerland GmbH, as seller, entered into an Asset Purchase Agreement, dated as of June 1, 2007 (the "Asset Purchase Agreement");

WHEREAS, the Company and its subsidiaries were formed in connection with the acquisition of the businesses and assets of two pharmaceutical plants owned directly or indirectly by Valeant Pharmaceuticals International Inc. and its Affiliates in accordance with the terms of the Securities Purchase Agreement and the Asset Purchase Agreement;

WHEREAS, the Company, Highland and Danzi acknowledge that Highland and Danzi are each entering into this Agreement in reliance on the representations and warranties in the Securities Purchase Agreement and the Asset Purchase Agreement;

WHEREAS, the Original Members acquired their Units in the Company contemporaneously with the consummation of the transactions contemplated by the Securities Purchase Agreement and the Asset Purchase Agreement and in reliance on the terms and conditions thereof;

WHEREAS, Crusader, Credit Strategies and Legacy Pharmaceuticals International GmbH, the wholly-owned subsidiary of the Company, entered into that certain Credit Agreement, dated as of even date herewith;

WHEREAS, the Original Members, set forth on Schedule I, own all of the currently outstanding Units of the Company in the amounts set forth opposite their names on Schedule I;

WHEREAS, the Company and the Original Members desire, for their mutual benefit and protection, to have this Agreement set forth their respective rights and obligations with respect to their ownership of Units of the Company and in order to provide for the issuance of additional Units in connection with a Restricted Unit Plan to be approved by the Management Committee as provided herein;

WHEREAS, the fully diluted capital structure of the Company as of the date hereof is as set forth on Schedule II; and

NOW, THEREFORE, in consideration of the mutual covenants and agreements set forth herein and for good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the parties hereto agree as follows:

## ARTICLE I
## THE COMPANY

**SECTION 1.1    Formation.** The Original Members hereby agree to form the Company as a limited liability company under and pursuant to the provisions of the Act and upon the terms and conditions set forth in this Agreement. The fact that the Certificate is on file in the office of the Secretary of State, State of Delaware, shall constitute notice that the Company is a limited liability company. Simultaneously with the execution of this Agreement and the formation of the Company, each of the Members shall be admitted as members of the Company. The rights and liabilities of the Members shall be as provided under the Act, the Certificate, and this Operating Agreement.

**SECTION 1.2    Name.** The name of the Company shall be Legacy Pharmaceuticals International, LLC and all business of the Company shall be conducted in such name. The Management Committee may change the name of the Company upon ten (10) Business Days notice to the Members.

**SECTION 1.3    Purpose; Powers.**

(a)    The purposes of the Company are (i) to operate the Business, (ii) to make such additional investments and engage in such additional activities as the Members may approve, and (iii) to engage in any and all lawful activities related or incidental to the purposes set forth in clauses (i) and (ii).

(b)    The Company has the power to do any and all acts necessary, appropriate, proper, advisable, incidental, or convenient to or in furtherance of the purposes of the Company set forth in Section 1.3(a) and has, without limitation, any and all powers that may be exercised on behalf of the Company by the Management Committee pursuant to Article V.

**SECTION 1.4    Principal Place of Business.** The principal place of business of the Company shall be at Rührbergstrasse 21, 4127 Birsfelden, Basel, Switzerland. The Management Committee may change the principal place of business of the Company to any other place within or without the State of Delaware upon ten (10) Business Days' notice to the Members. The registered office of the Company in the State of Delaware initially is located at 615 South Dupont Highway, Dover, Delaware 19901.

**SECTION 1.5    Term.** The term of the Company shall commence on the date the Certificate is filed in the office of the Secretary of State of the State of Delaware in accordance with the Act and shall continue until the winding up and liquidation of the Company and its business is completed following a Dissolution Event, as provided in Article XI. Prior to the time that the Certificate is filed, no Person shall represent to third parties the existence of the Company or hold himself out as a Member or Manager.

**SECTION 1.6    Filings; Agent for Service of Process.**

(a)    The Management Committee shall take any and all other actions reasonably necessary to perfect and maintain the status of the Company as a limited liability company under the laws of the State of Delaware, including the preparation and filing of such amendments to the Certificate and such other assumed name certificates, documents, instruments, and publications as may be required by law, including, without limitation, action to reflect:

(i)    A change in the Company name;

(ii)    A correction of false or erroneous statements in the Certificate or the desire of the Members to make a change in any statement therein in order that it shall accurately represent the agreement among the Members; or

(iii)    A change in the time for dissolution of the Company as stated in the Certificate and in this Agreement.

(b)    The Members and the Management Committee shall execute and cause to be filed original or amended certificates and shall take any and all other actions as may be reasonably necessary to perfect and maintain the status of the Company as a limited liability company or similar type of entity under the laws of any other jurisdictions in which the Company engages in business.

(c)    The registered agent for service of process on the Company in the State of Delaware shall be Capitol Services, Inc. or any successor as appointed by the Management Committee in accordance with the Act.

(d)    Upon the dissolution and completion of the winding up and liquidation of the Company in accordance with Article XI, the Management Committee shall promptly execute and cause to be filed a Certificate of Cancellation in accordance with the Act and the laws of any other jurisdictions in which the Management Committee deems such filing necessary or advisable.

**SECTION 1.7    Title to Property.**  All Property owned by the Company shall be owned by the Company as an entity and no Member shall have any ownership interest in such Property in its individual name, and each Member's interest in the Company shall be personal property for all purposes. At all times after the Effective Date, the Company shall hold title to all of its Property in the name of the Company and not in the name of any Member.

**SECTION 1.8    Payments of Individual Obligations.**  The Company's credit and assets shall be used solely for the benefit of the Company, and no asset of the Company shall be Transferred or encumbered for, or in payment of, any individual obligation of any Member.

**SECTION 1.9    Independent Activities; Transactions With Affiliates.**

(a)    Each Manager shall be required to devote such time to the affairs of the Company as may be necessary to manage and operate the Company, and shall be free to serve any other Person or enterprise in any capacity that such Manager may deem appropriate in his, her, or its discretion.

(b)    Insofar as permitted by applicable law, neither this Agreement nor any activity undertaken pursuant hereto shall prevent any Member or Manager or their Affiliates from engaging in whatever activities they choose, whether the same are competitive with the Company or otherwise, and any such activities may be undertaken without having or incurring any obligation to offer any interest in such activities to the Company or any Member, or require any Member or Manager to permit the Company or any other Manager or Member or its Affiliates to participate in any such activities, and as a material part of the consideration for the execution of this Agreement by each Member, each Member hereby waives, relinquishes, and renounces any such right or claim of participation. Notwithstanding the foregoing, if a Manager is also employed by the Company or any of its Affiliates, such Manager's rights to engage in activities shall be limited in accordance with the terms of such employment arrangement, whether written or oral, and if this Section 1.9(b) shall conflict with any term of such employment arrangement, the terms of the employment arrangement shall control.

(c)    To the extent permitted by applicable law and subject to the provisions of this Agreement, the Management Committee is hereby authorized to cause the Company to purchase Property from, sell Property to, or otherwise deal with any Member or Manager, acting on its own behalf, or any Affiliate of any Member or Manager; provided, however, that any such purchase, sale, or other transaction

shall be made on terms and conditions that are no less favorable to the Company than if the sale, purchase, or other transaction had been made with an independent third party.

SECTION 1.10    **Definitions.**  Capitalized words and phrases used in this Agreement have the meanings set forth in Annex A.

## ARTICLE II
## MEMBERS' CAPITAL CONTRIBUTIONS

SECTION 2.1    **Original Capital Contributions.**    The name, address, original Capital Contribution, and initial Percentage Interest of each of the Members, along with the amount of each Member's original Capital Contribution, are as follows:

| Name and Address | Original Capital Contribution | Percentage Interest |
|---|---|---|
| Highland Crusader Offshore Partners, L.P. c/o Highland Capital Management, L.P. Two Galleria Tower 13455 Noel Road, Suite 1300 Dallas, Texas 75240 | $500,000.00 | 25% (500,000 Units) |
| Highland Credit Strategies Master Fund, L.P. c/o Highland Capital Management, L.P. Two Galleria Tower 13455 Noel Road, Suite 1300 Dallas, Texas 75240 | $500,000.00 | 25% (500,000 Units) |
| Michael R. Danzi Twenty Eight Valerio Newport Beach, CA 92660 | $1,000,000.00 | 50% (1,000,000 Units) |

SECTION 2.2    **Additional Capital Contributions.** The Original Members may make additional Capital Contributions only with the Written Consent of all Original Members, in which event the Company shall issue to the contributing Member additional Units of an amount to be unanimously agreed by the Original Members.

SECTION 2.3    **Reservation of Units.**  The Original Members have reserved 352,941 Units (representing fifteen percent (15%) of the total issued and outstanding Units on a fully diluted basis) for issuance by the Company to certain employees as part of the Restricted Unit Plan to be approved by the Management Committee.

## ARTICLE III
## ALLOCATIONS

SECTION 3.1    **Allocations of Profits and Losses.**  Subject to Section 3.3, Profits and Losses for each Fiscal Year shall be allocated among the Members in proportion to their Percentage Interests.

SECTION 3.2    **Allocations on Transfers.** Income, gain, loss, deduction, or credit attributable to Units that have been Transferred shall be allocated between the transferor and the transferee as follows: (a) for the months before the Transfer, to the transferor; (b) for the months after the Transfer, to the transferee;

and (c) for the month of the Transfer, to the transferee if the Transfer occurs on or before the fifteenth (15th) day of the month and to the transferor if the Transfer occurs thereafter. For purposes of the above allocation, except for extraordinary items, which shall be allocated in a manner determined by the Managers, all such items shall be allocated equally among the months of the Fiscal Year without regard to the Company's operations during those months. Distributions of Company assets with respect to Units shall be made only to the Persons who, according to the records of the Company, are the owners, on the actual date of distribution, of the Units with respect to which the distributions are made. No liability shall result from making distributions in accordance with the provisions of the preceding sentence, whether or not any Member, any Manager or the Company has knowledge or notice of a Transfer or purported transfer of ownership of Units. All distributions with respect to the Transferred Units made on or before the date of such Transfer shall be made to the transferor, and all distributions thereafter shall be made to the transferee.

**SECTION 3.3      Built-in Allocations.** In accordance with Code Sections 704(b) and 704(c) and the Regulations thereunder, income, gain, loss, and deduction with respect to property actually or constructively contributed to the capital of the Company shall, solely for tax purposes, be allocated among the Members so as to take account of any variation at the time of the contribution between the tax basis of the property to the Company and its initial book value. If the book value of a Company asset is adjusted, then as provided in the Regulations promulgated under Code Section 704(b), subsequent allocations of income, gain, loss, and deduction with respect to that Company asset shall take account of any variation between the tax basis of the asset and its book value in the same manner as under Code Section 704(c) and the Regulations thereunder. Any elections or other decisions relating to those allocations shall be made by the tax matters partner in any manner that reasonably reflects the purpose and intent of this Agreement. Allocations of income, gain, loss, and deduction pursuant to this Section 3.3 are solely for purposes of federal, state, and local taxes and shall not affect, or in any way taken into account in computing, any Member's Capital Account or share of Profits, Losses, other tax items, or distributions pursuant to any provision of this Agreement.

**SECTION 3.4      Regulatory Compliance.** The Members hereby adopt these provisions of the Regulations issued under Code Section 704(b) that are required to be included in a partnership agreement as a condition to having the allocations of tax items set forth in the agreements respected for income tax purposes. The Members shall exercise the utmost good faith in cooperating to amend this Agreement to effect changes recommended by the Company's professional tax advisers to cause compliance with those Regulations, with nonbinding consultation from the tax advisers of any Member that desires to have any given in his behalf.

## ARTICLE IV
## DISTRIBUTIONS

**SECTION 4.1      Net Cash Flow.** Except as otherwise provided in Article XI, Net Cash Flow, if any, shall be distributed at such times as determined by all of the Original Members and to the Members in proportion to their Percentage Interests.

**SECTION 4.2      Amounts Withheld.** All amounts withheld pursuant to the Code or any provision of any state, local, or foreign tax law with respect to any payment, distribution, or allocation to the Company or the Members shall be treated as amounts paid or distributed, as the case may be, to the Members with respect to which such amount was withheld pursuant to this Section 4.2 for all purposes under this Agreement. The Company is authorized to withhold from payments and distributions, or with respect to allocations to the Members, and to pay over to any federal, state, local, or foreign government, any amounts required to be so withheld pursuant to the Code or any provisions of any other federal, state, local, or foreign law, and shall allocate any such amounts to the Members with respect to which such amount was withheld.

**SECTION 4.3     Limitations on Distributions.**

(a)     The Company shall make no distributions to the Members except (i) as provided in this Article IV and Article XI, or (ii) as agreed to by all of the Original Members.

(b)     A Member may not receive a distribution from the Company to the extent that, after giving effect to the distribution, all liabilities of the Company, other than liability to Members on account of their Capital Contributions, would exceed the fair value of the Company's assets.

**ARTICLE V**
**MANAGEMENT**

**SECTION 5.1     Managers; Management Committee.**

(a)     The management of the Company shall be vested in the committee of Managers (the "Management Committee") as provided in this Section 5.1. Unless otherwise provided herein, the act of a majority of the Managers shall be the act of the Management Committee.

(b)     Each Member shall vote its Units at any Members Meeting, or act by Written Consent with respect to its Units, and take all other actions necessary, to ensure that the Management Committee shall consist of at least two Managers and in no case, more than three Managers as set forth in this Section 5.1.

(c)     For so long as Highland and/or Affiliates of Highland beneficially own (as defined in Rule 13d-3 of the Exchange Act), individually or in the aggregate, at least fifteen percent (15%) of the then outstanding Units, they shall collectively have the right to designate to the Management Committee one individual (the "Highland Manager"). The initial Highland Manager shall be Brett Pope.

(d)     For so long as Danzi and/or Affiliates of Danzi beneficially own, individually or in the aggregate, at least fifteen percent (15%) of the then outstanding Units, they shall collectively have the right to designate to the Management Committee one individual (the "Danzi Manager"). The initial Danzi Manager shall be Michael R. Danzi (together with Brett Pope, the "Initial Managers").

(e)     The Danzi Manager shall, at any time, have the right to appoint an independent third Manager, who shall be reasonably acceptable to the Highland Manager (the "Independent Manager"); provided, however, no current or former officer, manager, director or employee of the Company or any Subsidiary or any Affiliate of a current or former officer, manager, director or employee of the Company or any Subsidiary shall be designated as the Independent Manager; provided, further, the Highland Manager may remove the Independent Manager at any time, for any reason or for no reason in the Highland Manager's sole discretion and the Danzi Manager shall have the right, pursuant to this Section 5.1(e) to appoint a replacement Independent Manager who shall be reasonably acceptable to the Highland Manager.

(f)     A Manager may be removed at any time, with or without cause, by the written notice of the Member that designated such Manager, delivered to the Company, demanding such removal or as otherwise provided in Section 5.1(e).

(g)     If at any time, a vacancy is created on the Management Committee by reason of the incapacity, death, removal or resignation of a Manager, then the Member that designated such Manager shall designate an individual who shall be elected to fill the vacancy until the next Members Meeting. Upon receipt of notice of the designation of a nominee pursuant to this Section 5.1(g), each Member shall, as soon as practicable after the date of such notice, take all reasonable actions, including the voting of its Units, to elect the director so designated to fill the vacancy.

(h)    Each Manager shall have one (1) vote. Except as otherwise provided in this Agreement, the Management Committee shall act by the affirmative vote of a majority of the total number of Managers on the Management Committee.

(i)    Each Manager shall perform his duties as a Manager in good faith, in a manner he reasonably believes to be in the best interests of the Company, and with such care as an ordinarily prudent person in a like position would use under similar circumstances. A person who so performs his duties shall not have any liability by reason of being or having been a Manager of the Company.

(j)    The Management Committee shall have the power to delegate authority to such committees of Managers, officers, employees, agents, and representatives of the Company as it may from time to time deem appropriate. Any delegation of authority to take any action must be approved in the same manner as would be required for the Management Committee to approve such action directly.

(k)    A Manager shall not be liable under a judgment, decree or order of court, or in any other manner, for a debt, obligation, or liability of the Company.

**SECTION 5.2    Meetings of the Management Committee.**

(a)    The Management Committee shall hold regular meetings no less frequently than once every Fiscal Quarter and shall establish meeting times, dates, and places, and requisite notice requirements (not shorter than those provided in Section 5.2(b)), and adopt rules or procedures consistent with the terms of this Agreement. Each regular meeting of the Management Committee shall be held at the offices of Highland, unless otherwise agreed upon by the Management Committee.  At such meetings the Management Committee shall transact such business as may properly be brought before the meeting, whether or not notice of such meeting referenced the action taken at such meeting.  Reasonable out-of-pocket expenses incurred by Managers and any representatives on behalf of any of the Members shall be reimbursed by the Company. Independent managers shall be compensated by the Company as is customary in the industry.

(b)    Special meetings of the Management Committee may be called by any Manager. Notice of each such meeting shall be given to each Manager on the Management Committee by telephone, telecopy, telegram, or similar method (in each case, notice shall be given at least twenty-four (24) hours before the time of the meeting) or sent by first-class mail (in which case notice shall be given at least three (3) days before the meeting), unless a longer notice period is established by the Management Committee. Each such notice shall state (i) the time, date, place (which shall be at the principal office of the Company unless otherwise agreed to by all Managers), or other means of conducting such meeting and (ii) the purpose of the meeting to be so held. No actions other than those specified in the notice may be considered at any special meeting unless unanimously approved by the Managers. Any Manager may waive notice of any meeting in writing before, at, or after such meeting. The attendance of a Manager at a meeting shall constitute a waiver of notice of such meeting, except when a Manager attends a meeting for the express purpose of objecting to the transaction of any business because the meeting was not properly called.

(c)    Notwithstanding anything to the contrary in this Section 5.2, any action required to be taken at a meeting of the Management Committee, or any action that may be taken at a meeting of the Management Committee, may be taken at a meeting held by means of conference telephone or other communications equipment by means of which all persons participating in the meeting can hear each other. Participation in such a meeting shall constitute presence in person at such meeting.

(d)   Notwithstanding anything to the contrary in this Section 5.2, the Management Committee may take without a meeting any action that may be taken by the Management Committee under this Agreement if such action is approved by the written consent of the Managers required to approve the relevant action.

**SECTION 5.3   Management Committee Powers.**  Except as otherwise provided in this Agreement, all powers to control and manage the business and affairs of the Company shall be exclusively vested in the Management Committee and the Management Committee may exercise all powers of the Company and do all such lawful acts as are not by statute, the Certificate, or this Agreement directed or required to be exercised or done by the Members and in so doing shall have the right and authority to take all actions that the Management Committee deems necessary, useful, or appropriate for the management and conduct of the Business, including exercising the following specific rights and powers:

(a)   Conduct its business, carry on its operations, and have and exercise the powers granted by the Act in any state, territory, district, or possession of the United States, or in any foreign country that may be necessary or convenient to effect any or all of the purposes for which it is organized;

(b)   Acquire by purchase, lease, or otherwise any real or personal property that may be necessary, convenient, or incidental to the accomplishment of the purposes of the Company;

(c)   Operate, maintain, finance, improve, construct, own, grant options with respect to, sell, convey, assign, mortgage, and lease any real estate and any personal property necessary, convenient, or incidental to the accomplishment of the purposes of the Company;

(d)   Execute any and all agreements, contracts, documents, certifications, and instruments necessary or convenient in connection with the management, maintenance, and operation of the Business, or in connection with managing the affairs of the Company, including, executing amendments to this Agreement and the Certificate in accordance with the terms of this Agreement, both as Managers and, if required, as attorney-in-fact for the Members pursuant to any power of attorney granted by the Members to the Managers;

(e)   Borrow money and issue evidences of indebtedness necessary, convenient, or incidental to the accomplishment of the purposes of the Company, and secure the same by mortgage, pledge, or other lien on any Company assets;

(f)   Execute, in furtherance of any or all of the purposes of the Company, any deed, lease, mortgage, deed of trust, mortgage note, promissory note, bill of sale, contract, or other instrument purporting to convey or encumber any or all of the Company assets;

(g)   Prepay in whole or in part, refinance, recast, increase, modify, or extend any liabilities affecting the assets of the Company and in connection therewith execute any extensions or renewals of encumbrances on any or all of such assets;

(h)   Care for and distribute funds to the Members by way of cash income, return of capital, or otherwise, all in accordance with the provisions of this Agreement, and perform all matters in furtherance of the objectives of the Company or this Agreement;

(i)   Contract on behalf of the Company for the employment and services or employees and/or independent contractors, such as lawyers and accountants, and delegate to such Persons the duty to manage or supervise any of the assets or operations of the Company;

(j)     Engage in any kind of activity and perform and carry out contracts of any kind (including contracts of insurance covering risks to Company assets and Manager liability) necessary or incidental to, or in connection with, the accomplishment of the purposes of the Company, as may be lawfully carried on or performed by a limited liability company under the laws of each state in which the Company is then formed or qualified;

(k)     Take, or refrain from taking, all actions, not expressly proscribed or limited by this Agreement, as may be necessary or appropriate to accomplish the purposes of the Company;

(l)     Institute, prosecute, defend, settle, compromise, and dismiss lawsuits or other judicial or administrative proceedings brought on or in behalf of, or against, the Company, the Members or any Manager in connection with activities arising out of, connected with, or incidental to this Agreement, and to engage counsel or others in connection therewith;

(m)     Purchase, take, receive, subscribe for or otherwise acquire, own, hold, vote, use, employ, sell, mortgage, lend, pledge, or otherwise dispose of, and otherwise use and deal in and with, Units or other interests in or obligations of domestic or foreign corporations, associations, general or limited companies, other limited liability companies, or individuals or direct or indirect obligations of the United States or of any government, state, territory, government district or municipality or of any instrumentality of any of them; and

(n)     Indemnify a Member or Manager or former Member or Manager, and make any other indemnification that is authorized by this Agreement in accordance with the Act.

**SECTION 5.4     Duties and Obligations of the Management Committee.**

(a)     The Management Committee shall cause the Company to conduct its Business separate and apart from that of any Member or Manager or any of its Affiliates, including, without limitation, (i) segregating Company assets and not allowing funds or other assets of the Company to be commingled with the funds or other assets of, held by, or registered in the name of any Member or Manager or any of its Affiliates, (ii) maintaining books and financial records of the Company separate from the books and financial records of any Member or Manager and its Affiliates, and observing all Company procedures and formalities, including, without limitation, maintaining minutes of Company meetings and acting on behalf of the Company only pursuant to due authorization of the Members, (iii) causing the Company to pay its liabilities from assets of the Company, and (iv) causing the Company to conduct its dealings with third parties in its own name and as a separate and independent entity.

(b)     The Management Committee shall take all actions that may be necessary or appropriate (i) for the continuation of the Company's valid existence as a limited liability company under the laws of the State of Delaware and of each other jurisdiction in which such existence is necessary to protect the limited liability of the Members or to enable the Company to conduct the business in which it is engaged and (ii) for the accomplishment of the Company's purposes, including the acquisition, development, maintenance, preservation, and operation of Property in accordance with the provisions of this Agreement and applicable laws and regulations.

(c)     The Management Committee shall be under a fiduciary duty to conduct the affairs of the Company in the best interests of the Company and of the Members, including the safekeeping and use of all of the Property and the use thereof for the exclusive benefit of the Company.

**SECTION 5.5     Reimbursements.** The Company shall reimburse the Members and Managers for all expenses incurred and paid by any of them in the organization of the Company and as authorized by the Company, in the conduct of the Company's business, including, but not limited to, expenses of maintaining an

office, telephones, travel, office equipment, and secretarial and other personnel as may reasonably be attributable to the Company. Such expenses shall not include any expenses incurred in connection with a Member's or Manager's exercise of its rights as a Member or a Manager apart from the authorized conduct of the Company's business. The Manager's sole determination of which expenses are allocated to and reimbursed as a result of the Company's activities or business and the amount of such expenses shall be conclusive. Such reimbursement shall be treated as expenses of the Company and shall not be deemed to constitute distributions to any Member of profit, loss, or capital of the Company.

### SECTION 5.6    Indemnification of the Managers.

(a)    Unless otherwise provided in this Section 5.6(d), the Company, its receiver, or its trustee (in the case of its receiver or trustee, to the extent of Company Property) shall indemnify, save harmless, and pay all judgments and claims against any Manager relating to any liability or damage incurred by reason of any act performed or omitted to be performed by any Manager in connection with the Business, including reasonable attorneys' fees incurred by the Manager in connection with the defense of any action based on any such act or omission, which attorneys' fees may be paid as incurred.

(b)    Unless otherwise provided in this Section 5.6(d), in the event of any action by a Member against any Manager, including a Company derivative suit, the Company shall indemnify, save harmless, and pay all expenses of such Manager, including reasonable attorneys' fees incurred in the defense of such action.

(c)    Unless otherwise provided in this Section 5.6(d), the Company shall indemnify, save harmless, and pay all expenses, costs, or liabilities of any Manager, if for the benefit of the Company and in accordance with this Agreement said Manager makes any deposit or makes any other similar payment or assumes any obligation in connection with any Property proposed to be acquired by the Company and suffers any financial loss as the result of such action.

(d)    Notwithstanding the provisions of Sections 5.6(a), 5.6(b), and 5.6(c), such Sections shall be enforced only to the maximum extent permitted by law and no Manager shall be indemnified from any liability for the fraud, intentional misconduct, gross negligence, or a knowing violation of the law that was material to the cause of action.

(e)    The obligations of the Company set forth in this Section 5.6 are expressly intended to create third-party beneficiary rights of each of the Managers and any Member is authorized, on behalf of the Company, to give written confirmation to any Manager of the existence and extent of the Company's obligations to such Manager hereunder.

(f)    Notwithstanding anything herein to the contrary, contemporaneously with the signing of this Agreement, or as promptly as reasonably practicable after, the Company shall enter into agreements to indemnify officers and Managers in form and substance reasonably acceptable to Highland and Danzi, which agreements shall provide indemnification to the fullest extent provided under applicable law.

### SECTION 5.7    Company Governance.

(a)    From and after the execution of this Agreement, each Member shall vote its Units at any regular or special meeting of Members of the Company (a "Members Meeting") or in any written consent executed in lieu of such a Members Meeting (a "Written Consent"), and shall take all other actions necessary, to give effect to the provisions of this Agreement (including, without limitation, this Article V) and to ensure that the Organizational Documents do not, at any time hereafter, conflict in any respect with the provisions of this Agreement; it being understood and agreed by the parties hereto that the Organizational Documents do not,

as of the date hereof, conflict in any respect with the provisions of this Agreement. In addition, each Member shall vote its Units at any Members Meeting or act by Written Consent with respect to such Units, upon any matter submitted for action by the Members or with respect to which such Member may vote or act by Written Consent, in conformity with the specific terms and provisions of this Agreement and the Organizational Documents. Within ninety (90) days after the end of the Company's Fiscal Year, commencing with the Company's Fiscal Year ending December 31, 2007, the Company shall hold an annual Members Meeting to, among other things, discuss the Company's Fiscal Year end financial results.

(b)     In order to effectuate the provisions of this Article V, each Member (i) hereby agrees that when any action or vote is required to be taken by such Member pursuant to this Agreement, such Member shall use its reasonable best efforts to call, or cause the appropriate officers and Managers of the Company to call, a Members Meeting, or to execute or cause to be executed a Written Consent to effectuate the taking of such Member action, (ii) shall use its reasonable best efforts to cause the Management Committee to adopt, either at a meeting of the Management Committee or by unanimous written consent of the Managers, all the resolutions necessary to effectuate the provisions of this Agreement, and (iii) shall use its reasonable best efforts to cause the Management Committee to cause the Secretary of the Company, or if there be no Secretary, such other officer of the Company as the Management Committee may appoint to fulfill the duties of Secretary, not to record any vote or consent contrary to the terms of this Article V.

(c)     The Management Committee shall appoint the senior management of the Company and shall establish policies and guidelines for the hiring of employees to permit the Company to act as an operating company with respect to its Business. The Management Committee may adopt appropriate management incentive plans and employee benefit plans, including, without limitation, the Restricted Unit Plan. The senior management of the Company shall be responsible for conducting, in the name of, and on behalf of, the Company, the day to day business and affairs of the Company. The initial officers of the Company shall consist of the following individuals:

> Michael R. Danzi, President and Chief Executive Officer
> David Smith, Vice President

To the extent that any of these individuals resigns or is terminated by the Company with or without cause, the Management Committee shall elect a successor, provided that in each case the successor is reasonably acceptable to the Highland Manager.

(d)     As soon as practicable following the date hereof and within 30 days of the date of this Agreement, the Company agrees to purchase director's and officer's insurance (or its equivalent), in reasonable and customary amounts satisfactory to Highland and Danzi.

(e)     In addition to the rights set forth in Section 5.1, the Company shall permit representatives of Highland or any of its Affiliates to attend all meetings of the Management Committee in a non-voting observer capacity and, in this respect, shall furnish such representatives with copies of all notices, minutes, consents, and other materials that it provides to its Managers; provided, however, each such representative shall agree to hold in confidence and trust with respect to all information so received in accordance with Section 6.10.

## ARTICLE VI
## ROLE OF MEMBERS

SECTION 6.1     **Rights or Powers.** The Members shall not have any right or power to take part in the management or control of the Company or its Business or to act for or bind the Company in any way.

Notwithstanding the foregoing, the Members have all the rights and powers specifically set forth in this Agreement and, to the extent not inconsistent with this Agreement, in the Act.

SECTION 6.2     **Voting Rights.**  No Member has any voting right except with respect to those matters specifically reserved for a Member vote that are set forth in this Agreement and as required in the Act.

SECTION 6.3     **Meetings of the Members.**

(a)     A Members Meeting may be called upon the written request of any Original Member. The call shall state the location of the meeting and the nature of the business to be transacted. Notice of any such Members Meeting shall be given to all Members not less than seven (7) business days or more than thirty (30) days prior to the date of such Members Meeting. Members may vote in person, by proxy, or by telephone at such Members Meeting and may waive advance notice of such Members Meeting. Whenever the vote or consent of Members is permitted or required under the Agreement, such vote or consent may be given at a Members Meeting or may be given in accordance with the procedure prescribed in this Section 6.3. Except as otherwise expressly provided in the Agreement, the vote of Members holding sixty-six and two-thirds percent (66 2/3%) of the outstanding Units shall be required to constitute the act of the Members.

(b)     For the purpose of determining the Members entitled to vote on, or to vote at, any Members Meeting or any adjournment thereof, the Management Committee or the Original Member requesting such Members Meeting may fix, in advance, a date as the record date for any such determination. Such date shall not be more than thirty (30) days nor less than ten (10) Business Days before any such meeting.

(c)     Each Member may authorize any Person or Persons to act for it by proxy on all matters in which a Member is entitled to participate, including waiving notice of any Members Meeting, or voting or participating at a Members Meeting. Every proxy must be signed by the Member or its attorney-in-fact. No proxy shall be valid after the expiration of eleven (11) months from the date thereof unless otherwise provided in the proxy. Every proxy shall be revocable at the pleasure of the Member executing it.

(d)     Each Members Meeting shall be conducted by the Chief Executive Officer or such other individual Person as the Chief Executive Officer deems appropriate.

(e)     Notwithstanding anything to the contrary contained in this Section 6.3, the Company may take any action contemplated under this Agreement as approved by the consent of the Members, such consent to be provided in writing, or by telephone or facsimile, if such telephone conversation or facsimile is followed by a written summary of the telephone conversation or facsimile communication sent by registered or certified mail, postage and charges prepaid, addressed as described in Section 14.1, or to such other address as such Person may from time to time specify by notice to the Members and Managers.

SECTION 6.4     **Required Member Consents.**  Notwithstanding any other provision of this Agreement, no action may be taken by the Company (whether by the Management Committee or otherwise) in connection with any of the following matters without the written consent of all the Original Members:

(a)     redeem, purchase or otherwise acquire (or pay into or set aside for a sinking fund for such purpose) any Units, any other class or series of interests issued by the Company or any securities exercisable or exchangeable for or convertible into equity securities of the Company;

(b)     dissolve, liquidate, or wind up the affairs of the Company;

(c)     pay or declare a distribution on any class of Units;

(d)       amend, change, repeal or waive any provision of the Certificate of Formation and/or any other organizational documents of the Company (the "Organizational Documents");

(e)       authorize any increase in the number of Units available for issuance or purchase pursuant to the Restricted Unit Plan as set forth on Schedule II;

(f)       authorize any increase or decrease in the number of Managers, except as specified in Section 5.1;

(g)       enter into any transaction or business arrangement (other than customary employment arrangements approved by the Management Committee in the ordinary course) with (A) any Member holding five percent (5%) or more of the Company's equity securities on a fully diluted, as-converted basis, or any officer or manager or (B) any Affiliate of any such Person or Affiliate which such Person has a material financial interest;

(h)       enter into any merger, consolidation, reorganization or other transaction in which the Members prior to such transaction would not retain a majority of the voting power of the surviving entity, or enter into a sale of all or substantially all of the assets of the Company;

(i)       increase or decrease the total number of authorized Units or authorize Units of any additional class or series, preferred or common, of units or any increase in any authorization thereof;

(j)       create or issue, or oblige itself to do the same, of any other equity security (including any security convertible into or exercisable for any equity security), including any security senior to or on parity with the Units as to voting, dividends, redemption or conversion or upon liquidation or acquisition other than as contemplated pursuant to the Company's Restricted Unit Plan;

(k)       amend or otherwise change any executive employment or compensation arrangement;

(l)       recapitalize or reclassify the Company's ownership interests in any manner;

(m)       make any loans or advances to employees (other than loans in the ordinary course of business as part of travel advances or salary and for the purchase of this Company's Units under the Restricted Unit Plan);

(n)       authorize capital expenditures that exceed $10,000 total annual capital expenditures that are not included in the annual operating budget approved by the Management Committee;

(o)       make guarantees except in the ordinary course of business;

(p)       change the nature or scope of the Company's Business; and

(q)       own or permit any Subsidiary to own, any stock or other securities of any other entity unless it is wholly-owned, directly or indirectly, by the Company.

**SECTION 6.5      Information Rights.**

(a)       The Company shall furnish the following reports to each Original Member:

(i)       As soon as practicable after the end of each Fiscal Year of the Company, and in any event within 120 days after the end of each Fiscal Year, a consolidated balance sheet of the

Company and its Subsidiaries, if any, as of the end of such Fiscal Year, and consolidated statements of income and cash flows of the Company and its Subsidiaries, if any, for such year, prepared in accordance with GAAP and setting forth in each case in comparative form the figures for the previous Fiscal Year, all in reasonable detail and certified by independent public accountants of recognized national standing selected by the Company, and a Company-prepared comparison to the Company's operating budget then in effect.

(ii)     As soon as practicable after the end of the first, second, and third Fiscal Quarters of the Company, and in any event within forty-five (45) days after the end of each such Fiscal Quarters, a consolidated balance sheet of the Company and its Subsidiaries, if any, as of the end of each such quarterly period and consolidated statements of income and cash flows of the Company and its Subsidiaries, if any, for such period and for the current Fiscal Year to date, prepared in accordance with GAAP and setting forth in comparative form the figures for the corresponding periods of the previous Fiscal Year, all in reasonable detail and certified by the principal financial or accounting officer of the Company, subject to changes resulting from normal year-end audit adjustments, except that such financial statements need not contain the notes required by GAAP.

(iii)     As soon as is practicable after the end of each calendar month, and in any event within thirty (30) days thereafter, a consolidated balance sheet of the Company and its Subsidiaries, if any, as of the end of each such monthly period and consolidated statements of income and cash flows of the Company and its Subsidiaries, if any, for such period and for the current Fiscal Year to date, prepared in accordance with GAAP and setting forth in comparative form the figures for the corresponding periods of the previous Fiscal Year, all in reasonable detail and certified by the principal financial or accounting officer of the Company, subject to changes resulting from normal year-end audit adjustments, except that such financial statements need not contain the notes required by GAAP. In addition, as soon as practicable after the end of each calendar month, and in any event within thirty (30) days thereafter, the Company will deliver a monthly executive summary of the Company's activities to each Original Member.

(iv)     As soon as available, but in any event not later than thirty (30) days prior to the beginning of each new Fiscal Year, an operating budget for such Fiscal Year approved by the Management Committee.

(v)     With reasonable promptness, such other notices, information, and data with respect to the Company and its Subsidiaries, if any, as the Company delivers to its Members and such other information and data as a Member may from time to time reasonably request

(b)     In addition to the information rights provided in Section 6.5(a), the Company shall provide the following:

(i)     The Company shall permit any Member (or its representatives) to visit and inspect any of the properties of the Company, including its books of account and other records (and make copies of and take extracts from such books and records), and to discuss its affairs, finances, and accounts with the Company's officers and its independent public accountants, all at such reasonable times and as often as any such person may reasonably request.

(ii)     The provisions of this Section 6.5(b) shall not be in limitation of any rights which any Member may have with respect to the books and records of the Company and its Subsidiaries, or to inspect their properties or discuss their affairs, finances, and accounts, under the laws of the jurisdictions in which they are incorporated.

(iii)     Anything in to the contrary notwithstanding, no Member by reason of this Agreement shall have access to any trade secrets or classified information of the Company. Each Member hereby agrees to hold in confidence and trust and not to misuse or disclose any confidential information provided pursuant to this Section 6.5(b). The Company shall not be required to comply with this Section 6.5(b) in respect of any Member whom a majority of the Management Committee reasonably determines to be a competitor of the Company or an officer, employee, manager, director, or a holder of greater than 10% voting power or ownership interest of any person the Management Committee reasonably determines to be a competitor of the Company.

**SECTION 6.6     Withdrawal/Resignation.** Except as otherwise provided in Articles IV and XI, no Member shall demand or receive a return on or of its Capital Contributions or withdraw from the Company without the Written Consent of all Original Members. Except as otherwise provided in the Act or this Agreement, upon resignation, any resigning Member is entitled to receive only the distribution to which he is entitled under this Agreement, which shall be equal to the fair value of his Units in the Company as of the date of resignation. Under circumstances requiring a return of any Capital Contributions, no Member has the right to receive Property other than cash except as may be specifically provided herein.

**SECTION 6.7     Member Compensation.** No Member shall receive any interest, salary, or drawing with respect to its Capital Contributions or its Capital Account or for services rendered on behalf of the Company, or otherwise, in its capacity as a Member, except as otherwise provided in this Agreement.

**SECTION 6.8     Members Liability.** No Member shall be liable under a judgment, decree, or order of a court, or in any other manner, for the Debts or any other obligations or liabilities of the Company. A Member shall be liable only to make its Capital Contributions and shall not be required to restore a deficit balance in its Capital Account or to lend any funds to the Company or, after its Capital Contributions have been made, to make any additional contributions, assessments, or payments to the Company, provided that a Member may be required to repay distributions made to it as provided in Section 18-607 of the Act. The Manager shall not have any personal liability for the repayment of any Capital Contributions of any Member.

**SECTION 6.9     Partition.** While the Company remains in effect or is continued, each Member agrees and waives its rights to have any Company Property partitioned, or to file a complaint or to institute any suit, action, or proceeding at law or in equity to have any Company Property partitioned, and each Member, on behalf of itself, its successors, and its assigns hereby waives any such right.

**SECTION 6.10     Confidentiality.** Except as contemplated hereby or required by a court of competent authority, each Member shall keep confidential and shall not disclose to others and shall use its reasonable efforts to prevent its Affiliates and any of its, or its Affiliates', present or former employees, agents, and representatives from disclosing to others without the prior written consent of all Members any information that (i) pertains to this Agreement, any negotiations pertaining thereto, any of the transactions contemplated hereby, or the Business of the Company or (ii) pertains to confidential or proprietary information of any Member or the Company or that any Member has labeled in writing as confidential or proprietary, provided that any Member may disclose to its Parent and its Parent's employees, agents, and representatives any information made available to such Member. No Member shall use, and each Member shall use its best efforts to prevent any Affiliate of such Member from using, any information that (i) pertains to this Agreement, any negotiations pertaining hereto, any of the transactions contemplated hereby, or the Business of the Company or (ii) pertains to the confidential or proprietary information of any Member or the Company or that any Member has labeled in writing as confidential or proprietary, except in connection with the transactions contemplated hereby. The term "confidential information" is used in this Section 6.10 to describe information that is confidential, non-public, or proprietary in nature, was provided to such Member or its representatives by the Company, any other Member, or such Persons' agents, representatives, and employees, and relates either

directly or indirectly to the Company or the Business. Information that (i) is available, or becomes available, to the public through no fault or action by such Member, its agents, representatives or employees or (ii) becomes available on non-confidential basis from any source other than the Company, any other Member, or such Persons' agents, representatives, or employees and such source is not prohibited from disclosing such information, shall not be deemed confidential information.

**SECTION 6.11   Transactions Between a Member and the Company.** Except as otherwise provided by applicable law, any Member may, but shall not be obligated to, lend money to the Company, act as surety for the Company and transact other business with the Company and has the same rights and obligations when transacting business with the Company as a person or entity who is not a Member. A Member, any Affiliate or a employee, member, agent, director, or officer of a Member or any Affiliate thereof, may also be an employee or be retained as an agent of the Company. The existence of these relationships and acting in such capacities will not result in the Member being deemed to be participating in the control of the business of the Company or otherwise affect the limited liability of the Member.

**SECTION 6.12   Other Instruments.** Each Member hereby agrees to execute and deliver to the Company within five (5) days after receipt of a written request therefor, such other and further documents and instruments, statements of interest and holdings, designations, powers of attorney, and other instruments and to take such other action as the Management Committee deems reasonably necessary, useful, or appropriate to comply with any laws, rules, or regulations as may be necessary to enable the Company to fulfill its responsibilities under this Agreement.

**SECTION 6.13   Conversion.** At any time the Company has a fair market value of at least $75,000,000, at the request of Highland, the Management Committee shall cause Company to convert from a limited liability company into a corporation in order to effectuate an Initial Public Offering. If the Company continues in a corporate form, the stockholders of the corporation (being the former Members of the Company) shall enter into a Stockholder's Agreement on substantially the terms and conditions and in the form attached hereto as Exhibit E.

## ARTICLE VII
## REPRESENTATIONS AND WARRANTIES

**SECTION 7.1   In General.** As of the Effective Date, each of the Original Members hereby make each of the representations and warranties applicable to such Member as set forth in this Section 7.2, and such warranties and representations shall survive the execution of this Agreement.

**SECTION 7.2   Representations and Warranties.** Each Original Member hereby represents and warrants that:

(a)   **Due Incorporation or Formation; Authorization of Agreement.**

(i)   If such Original Member is an entity, such Original Member is a corporation duly organized or a partnership or limited liability company duly formed, validly existing, and in good standing under the laws of the jurisdiction of its incorporation or formation and has the corporate, partnership, or company power and authority to own its property and carry on its business as owned and carried on at the date hereof and as contemplated hereby. Such Original Member is duly licensed or qualified to do business and in good standing in each of the jurisdictions in which the failure to be so licensed or qualified would have a material adverse effect on its financial condition or its ability to perform its obligations hereunder. Such Original Member has the corporate, partnership, or company power and authority to execute and deliver this Agreement and to perform its obligations hereunder

and the execution, delivery, and performance of this Agreement has been duly authorized by all necessary corporate, partnership, or company action. This Agreement constitutes the legal, valid, and binding obligation of such Original Member.

(ii)    If such Original Member is an individual, such Original Member has the power and authority to execute and deliver this Agreement and to perform its obligations hereunder and the execution, delivery, and performance of this Agreement has been duly authorized by all necessary action. This Agreement constitutes the legal, valid, and binding obligation of such Original Member.

(b)    **No Conflict With Restrictions; No Default.** Neither the execution, delivery, and performance of this Agreement nor the consummation by such Original Member of the transactions contemplated hereby (i) will conflict with, violate, or result in a breach of any of the terms, conditions, or provisions of any law, regulation, order, writ, injunction, decree, determination, or award of any court, any governmental department, board, agency, or instrumentality, domestic or foreign, or any arbitrator, applicable to such Original Member or any of its Wholly-Owned Affiliates, (ii) will conflict with, violate, result in a breach of, or constitute a default under any of the terms, conditions, or provisions of the articles of incorporation, bylaws, partnership agreement or operating agreement of such Original Member or any of its Wholly-Owned Affiliates or of any material agreement or instrument to which such Original Member, or any of its Wholly-Owned Affiliates is a party or by which such Original Member or any of its Wholly-Owned Affiliates is or may be bound or to which any of its material properties or assets is subject, (iii) will conflict with, violate, result in a breach of, constitute a default under (whether with notice or lapse of time or both), accelerate or permit the acceleration of the performance required by, give to others any material interests or rights, or require any consent, authorization, or approval under any indenture, mortgage, lease agreement, or instrument to which such Original Member or any of its Wholly-Owned Affiliates is a party or by which such Original Member or any of its Wholly-Owned Affiliates is or may be bound, or (iv) will result in the creation or imposition of any lien upon any of the material properties or assets of such Original Member or any of its Wholly-Owned Affiliates.

(c)    **Governmental Authorizations.** Any registration, declaration, or filing with, or consent, approval, license, permit, or other authorization or order by, any governmental or regulatory authority, domestic or foreign, that is required in connection with the valid execution, delivery, acceptance, and performance by such Original Member under this Agreement or the consummation by such Original Member of any transaction contemplated hereby has been completed, made, or obtained on or before the Effective Date.

(d)    **Litigation.** Except as disclosed on Schedule IV hereto, there are no actions, suits, proceedings, or investigations pending or, to the knowledge of such Original Member or any of its Wholly-Owned Affiliates, threatened against or affecting such Original Member or any of its Wholly-Owned Affiliates or any of their properties, assets, or businesses in any court or before or by any governmental department, board, agency, or instrumentality, domestic or foreign, or any arbitrator that could, if adversely determined (or, in the case of an investigation could lead to any action, suit, or proceeding, that if adversely determined could) reasonably be expected to materially impair such Original Member's ability to perform its obligations under this Agreement or to have a material adverse effect on the consolidated financial condition of such Original Member; and such Original Member or any of its Wholly-Owned Affiliates has not received any currently effective notice of any default, and such Original Member or any of its Wholly-Owned Affiliates is not in default, under any applicable order, writ, injunction, decree, permit, determination, or award of any court, any governmental department, board, agency, or instrumentality, domestic or foreign, or any arbitrator that could reasonably be expected to materially impair such Original Member's ability to perform its obligations under this Agreement or to have a material adverse effect on the consolidated financial condition of such Original Member.

(e)    **Investment Company Act; Public Utility Holding Company Act.** Neither such Original Member nor any of its Affiliates is, nor will the Company as a result of such Original Member holding an ownership interest therein be, an "investment company" as defined in, or subject to regulation under, the Investment Company Act of 1940. Neither such Original Member nor any of its Affiliates is, nor will the Company as a result of such Original Member holding an ownership interest therein be, a "holding company," "an affiliate of a holding company," or a "subsidiary of a holding company" as defined in, or subject to regulation under, the Public Utility Holding Company Act of 1935.

(f)    **Investigation.** Such Original Member is acquiring its Units based upon its own investigation, and the exercise by such Original Member of its rights and the performance of its obligations under this Agreement will be based upon its own investigation, analysis, and expertise. Such Original Member's acquisition of its Units is being made for its own account for investment, and not with a view to the sale or distribution thereof. Such Original Member is a sophisticated investor possessing an expertise in analyzing the benefits and risks associated with acquiring investments that are similar to the acquisition of its Units.

**SECTION 7.3    Indemnification.** From and after the date hereof, each Original Member agrees to indemnify and hold harmless each other Original Member and each of their respective officer and directors, and each Person who controls (within the meaning of Section 15 of the Securities Act) such Original Member from and against any and all losses, claims, damages, liabilities, and expenses (including reasonable costs of investigation), joint or several, arising out of or based upon any untrue, or allegedly untrue, statement of a material fact contained in any representation or warranty set forth in Section 7.2.

## ARTICLE VIII
## ACCOUNTING, BOOKS AND RECORDS

**SECTION 8.1    Accounting, Books and Records.**

(a)    The Company shall keep on site at its principal place of business each of the following:

(i)    Separate books of account for the Company that shall show a true and accurate record of all costs and expenses incurred, all charges made, all credits made and received, and all income derived in connection with the conduct of the Company and the operation of the Business in accordance with this Agreement;

(ii)    A current list of the full name and last known business, residence, or mailing address of each Member and Manager, both past and present;

(iii)    A copy of the Certificate and all amendments thereto, together with executed copies of any powers of attorney pursuant to which any amendment has been executed;

(iv)    Copies of the Company's federal, state, and local income tax returns and reports, if any, for the three most recent years;

(v)    Copies of this Agreement;

(vi)    Copies of any writings permitted or required under Section 18-502 of the Act regarding the obligation of a Member to perform any enforceable promise to contribute cash or property or to perform services as consideration for such Member's Capital Contribution;

        (vii)     Unless contained in this Agreement, a statement prepared and certified as accurate by the Management Committee of the Company that describes:

        (A)     The amount of cash and a description and statement of the agreed value of the other property or services contributed by each Member and that each Member has agreed to contribute in the future;

        (B)     The times at which or events on the happening of which any additional Capital Contributions agreed to be made by each Member are to be made;

        (C)     If agreed upon, the time at which or the events on the happening of which a Member may terminate his Units in the Company and the amount of, or the method of determining, the distribution to which he may be entitled respecting his Units and the terms and conditions of the termination and distribution; and

        (D)     Any right of a Member to receive distributions, which include a return of all or any part of a Member's contribution;

        (viii)     Any Written Consents obtained from Members pursuant to Section 18-302 of the Act regarding action taken by Members without a meeting; and

        (ix)     Copies of the agreement of each Member who is not a resident of the State of Delaware to file a Delaware income tax return in accordance with the provisions of Title 30 of the Delaware Code and to make timely payment of all taxes imposed on him by the State of Delaware with respect to the income of the Company and to be subject to personal jurisdiction in Delaware for purposes of the collection of such income taxes, together with related interest and penalties imposed on the Member by the State of Delaware with respect to the Company's income.

        (b)     The Company shall use the accrual method of accounting in preparation of its financial reports and for tax purposes and shall keep its books and records accordingly. Any Member or its designated representative has the right to have reasonable access to and inspect and copy the contents of such books or records and shall also have reasonable access during normal business hours to such additional financial information, documents, and books and records. The rights granted to a Member pursuant to this Section 8.1 are expressly subject to compliance by such Member with the safety, security, and confidentiality procedures and guidelines of the Company, as such procedures and guidelines may be established from time to time.

**SECTION 8.2**    **Reports.**    The chief financial officer of the Company shall be responsible for causing the preparation of financial reports of the Company and the coordination of financial matters of the Company with the Company's accountants.

**SECTION 8.3    Tax Matters.**

(a)    **Tax Elections.** The Management Committee shall, without any further consent of the Members being required (except as specifically required herein), make any and all elections for federal, state, local, and foreign tax purposes including, without limitation, any election, if permitted by applicable law: (i) to make the election provided for in Code Section 6231(a)(1)(B)(ii); (ii) to adjust the basis of Property pursuant to Code Sections 754, 734(b), and 743(b), or comparable provisions of state, local, or foreign law, in connection with Transfers of Units and Company distributions; (iii) with the consent of all of the Members, to extend the statute of limitations for assessment of tax deficiencies against the Members with respect to adjustments to the Company's federal, state, local, or foreign tax returns; and (iv) to the extent provided in Code Sections 6221 through 6231 and similar provisions of federal, state, local, or foreign law, to represent the Company and the Members before taxing authorities or courts of competent jurisdiction in tax matters affecting the Company or the Members in their capacities as Members, and to file any tax returns and execute any agreements or other documents relating to or affecting such tax matters, including agreements or other documents that bind the Members with respect to such tax matters or otherwise affect the rights of the Company and the Members. Michael R. Danzi is specifically authorized to act as the "Tax Matters Member" under the Code and in any similar capacity under state or local law.

(b)    **Tax Information.** Necessary tax information shall be delivered to each Member as soon as practicable after the end of each Fiscal Year of the Company but not later than five (5) months after the end of each Fiscal Year.

## ARTICLE IX
## AMENDMENTS

**SECTION 9.1    Amendments.**

(a)    Amendments, supplements or modifications to this Agreement may be proposed by any Manager or any Member. Following such proposal, the Management Committee shall submit to the Members a verbatim statement of any proposed amendment, supplement or modification, providing that counsel for the Company shall have approved of the same in writing as to form, and the Management Committee shall include in any such submission a recommendation as to the proposed amendment, supplement or modification. The Management Committee shall seek the written vote of the Members on the proposed amendment, supplement or modification or shall call a meeting to vote thereon and to transact any other business that it may deem appropriate. A proposed amendment shall be adopted and be effective as an amendment hereto if it receives the affirmative vote of the Members owning a Majority; provided, however, except as may be otherwise expressly set forth herein, any amendment, supplement or modification must be approved, or consented to, by Danzi and Highland. Any such amendment, supplement or modification shall be binding upon the Company and all of the Members.

(b)    Notwithstanding this Section 9.1(a), this Agreement shall not be amended, supplemented or modified without the consent of each Member disproportionately adversely economically affected if such amendment would (i) modify the limited liability of a Member or (ii) alter the interest of a Member in Profits, Losses, other items, or any Company distributions.

**SECTION 9.2    Waiver.** Except as specifically set forth in this Agreement, no failure or delay on the part of any party hereto in exercising any right, power or remedy hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any such right, power or remedy preclude any other or further exercise thereof or the exercise of any other right, power or remedy. Any waiver or consent to depart from the terms of this Agreement or any provisions herein must be approved, or consented to, by Danzi and Highland.

Any such waiver or consent shall by binding upon the Company and all of the Members. The remedies provided for herein are cumulative and are not exclusive of any remedies that may be available to the parties hereto at law, in equity or otherwise.

## ARTICLE X
## TRANSFERS

**SECTION 10.1    Restrictions on Transfer.** No Member shall sell, give, assign, hypothecate, pledge, encumber, grant a security interest in or otherwise dispose of (whether by operation of law or otherwise) (each a "Transfer") any Units or any right, title or interest therein or thereto, except in accordance with the provisions of this Agreement and all applicable federal and state securities laws. Any attempt to transfer any Units or any rights thereunder in violation of the preceding sentence shall be null and void *ab initio* and neither the Company nor any transfer agent shall give effect in the Company's ownership interest records to such attempted transfer.

**SECTION 10.2    Exceptions to Restrictions.** Notwithstanding anything to the contrary contained in this Agreement, subject to all applicable laws, and subject to the transfer restrictions set forth in Section 10.4, the restrictions on Transfer set forth in Section 10.1 shall not apply to any of the following:

(a)    a Transfer by a Member of Units to one of its Permitted Transferees other than pursuant to Sections 10.2(b) or (c); provided, however, that such Permitted Transferee executes and delivers to the Company a Joinder Agreement substantially in the form annexed hereto as Exhibit B-1 (the "Joinder Agreement");

(b)    a Transfer of Units by a Member in accordance with Section 10.5 and Section 10.6; and

(c)    a Transfer by a Member, after such Member has complied with Section 10.4, if applicable; provided, however, that the transferee executes and delivers to the Company a Joinder Agreement.

**SECTION 10.3    Prohibited Transfers.** Notwithstanding anything to the contrary contained herein, no Member may transfer any Units to a Prohibited Transferee, other than where any Member is required, or anticipates being required within the following twelve month period, under applicable law or regulations, or as a result of any action by any Government Authority, to divest itself of any or all of its Units; provided, however, that any transfer of Units pursuant to the foregoing shall be subject to the provisions of Section 10.4.

**SECTION 10.4    Right of First Refusal.** In addition to the other limitations and restrictions set forth in this Article X, except as permitted by Section 10.2, no Member shall Transfer all or any portion of its Units unless such Member first offers to sell the Offered Units pursuant to the terms of this Section 10.4.

(a)    **Rights of First Refusal.** Except for Transfers made by a Tag-Along Member (but not a Tag-Along Offeror) pursuant to Section 10.5 or a Required Seller or Drag-Along Seller pursuant to Section 10.6, if a Member, or group of Members (each a "Proposed Seller"), agrees to a bona fide offer to sell or otherwise dispose of (a "Proposed Sale") all or any portion of its Units (the "Offered Units") to a Person or group of Persons (other than to a Permitted Transferee) (a "Proposed Sale Purchaser") in a transaction or series of related transactions, then upon the demand of the Company or, if the Company does not fully exercise such right, upon the demand of the Original Members, such Proposed Seller shall be required to sell to the Company or the Original Members, as the case may be, all, and not less than all, of the Offered Units at the same price

and on the same terms and conditions, including the time of payment and the form of consideration, as the Proposed Sale in accordance with this Section 10.4.

(b)     **Proposed Sale Notice.**  The Proposed Seller shall provide the Company and each Original Member with written notice (the "Proposed Sale Notice") not less than thirty (30) days prior to the date of the Proposed Sale (the "Proposed Sale Date").  Each Proposed Sale Notice shall set forth: (i) the name and address of the Proposed Sale Purchaser; (ii) the name and address of the Proposed Sellers; (iii) the proposed amount and form of consideration to be paid for the Offered Units and the terms and conditions of payment offered by the Proposed Sale Purchaser; (iv) the number and class of Offered Units proposed to be sold or otherwise disposed of by the Proposed Sellers; (v) the Proposed Sale Date; and (vi) any other material terms and conditions of the Proposed Sale.  The Proposed Sale Notice shall further state that the Company or the Original Member may acquire all of the Offered Units for the price and upon the terms set forth therein in accordance with the provisions of this Agreement.  The Proposed Sale Notice shall be deemed to be given when mailed to the address for the Company and for each Original Member that is set forth on the Company's books.  The Company will provide the Proposed Sellers with any information in the Company's possession that is required for the Proposed Sellers to provide the Proposed Sale Notice, and will reasonably cooperate with the Proposed Sellers to facilitate the preparation and delivery of such Proposed Sale Notice.

(c)     **Participation Notice.**

(i)     If the Company wishes to exercise its right of first refusal, it must send a notice (the "Company Purchase Notice") within thirty (30) days of the deemed receipt of the Proposed Sale Notice to the Proposed Sellers of its good faith intent to purchase the Offered Units on the terms and conditions set forth in the Proposed Sale Notice.  The Company Purchase Notice shall set forth the number of Offered Units that the Company intends to purchase.  If the Company does not exercise its right to purchase all of the Offered Units, it shall promptly so notify the Original Members (no later than thirty (30) days from the deemed receipt of the Proposed Sale Notice) and the Original Members will have the right to purchase all or any portion of the remaining Offered Units (provided that only Original Members then holding Units may purchase any Offered Units pursuant to this Section 10.4).  Any Original Member wishing to exercise its right to purchase such Offered Units (each, a "Participating Member") must send a notice (each, a "Members Purchase Notice") within thirty (30) days from the deemed receipt of notice from the Company that the Company is not exercising its right of first refusal with respect to all of the Offered Units to the Proposed Sellers of its good faith intent to purchase such Offered Units on the terms and conditions set forth in the Proposed Sale Notice.  Each Participating Member will be entitled to purchase the number of Offered Units remaining available for purchase after the Company's exercise of its purchase right hereunder, in an amount equal to its pro rata portion (based on the percentage equal to the Units held by such Participating Member divided by the Units held by the Participating Members in the aggregate) of such remaining Offered Units.  Each of the Company Purchase Notice and the Member Purchase Notice shall be deemed to be given when mailed to the address for each Member, as applicable, that is set forth on the Company's books.  Notwithstanding the Proposed Sale Date, (i) the closing date of any purchase of the Offered Units by the Company shall have occurred not later than ninety (90) days following the deemed receipt of the Company Purchase Notice and (ii) the closing date of any purchase of the Offered Units by a Participating Member shall have occurred not later than ninety (90) days following the deemed receipt of such Participating Member's Members Purchase Notice (each, a "ROFR Purchase Deadline").  If the Company purchases less than all of the Offered Units for which it has subscribed under the Company Purchase Notice, each of the Participating Members may purchase any remaining Offered Units in an amount equal to its pro rata portion (based on the percentage equal to the Units held by such Participating Member divided by the Units held by the

Participating Members in the aggregate), provided the closing date of such purchase occurs prior to the ROFR Purchase Deadline.

(ii) If the Company and/or the Participating Members do not purchase all of the Offered Units prior to the ROFR Purchase Deadline, notwithstanding the Proposed Sale Date, the Proposed Seller must sell the remaining Offered Units, if at all, to the Proposed Sale Purchaser within ninety (90) days after the earlier of (x) the closing date of the Company's and the Participating Members' purchase of their respective portions of the Offered Units and (y) the applicable ROFR Purchase Deadline. The Proposed Sellers must sell the Offered Units on terms and conditions no more favorable in any material respect to the Proposed Sellers than as stated in the Proposed Sale Notice. In addition, any such Proposed Sale shall be subject to the restrictions set forth herein.

(d) **Involuntary Transfer.** In the case of any Transfer of title or beneficial ownership of Units upon default, foreclosure, forfeit, court order, or otherwise than by a voluntary decision on the part of a Member (an "Involuntary Transfer"), such Member (or his legal representatives) shall promptly (but in no event later than two (2) Business Days after such purported Involuntary Transfer) furnish written notice to the Company indicating that the purported Involuntary Transfer is pending, specifying the name of the Person to whom such Units are expected to be transferred, giving a detailed description of the circumstances giving rise to, and stating the legal basis for, the purported Involuntary Transfer. Notwithstanding the foregoing, Article X and Section 10.9 shall apply to Involuntary Transfers.

(e) **Coordination with Other Provisions.** The rights granted pursuant to this Section 10.4 shall take precedence over the rights granted pursuant to Section 10.5 but shall be subject to the rights granted pursuant to Section 10.6.

**SECTION 10.5    Tag-Along Rights.**

(a) **Right to Participate in Sale.** Except as a Required Seller pursuant to Section 10.6, if at any time any Member or Members (each a "Tag-Along Offeror") propose to Transfer to any Person or group of Persons (other than an Affiliate of such Member) (a "Tag-Along Purchaser") in one transaction or a series of related transactions Units comprising at least twenty percent (20%) or more of the Units outstanding at such time (such Transfer, a "Tag-Along Sale"), then such Tag-Along Offerors shall afford all the holders of Units (each such holder of Units is referred to herein as a "Tag-Along Member") the opportunity to participate proportionately in such Tag-Along Sale on the same terms and conditions provided to the Tag-Along Offerors, including the time of payment and the form and amount of consideration, in accordance with this Section 10.5. The number of Units that each Tag-Along Member shall be entitled to include in such Tag-Along Sale (the "Tag-Along Allotment") shall be determined by multiplying (i) a fraction, the numerator of which shall equal the number of Units held of record by such Tag-Along Member as of the close of business on the day immediately prior to the Tag-Along Notice Date and the denominator of which shall equal the total number of Units outstanding as of the close of business on the day immediately prior to the Tag-Along Notice Date by (ii) the number of Units, respectively, proposed by the Tag-Along Offerors to be Transferred pursuant to the Tag-Along Sale.

(b) **Sale Notice.** The Tag-Along Offerors shall provide each Tag-Along Member and the Company with written notice (the "Tag-Along Sale Notice") not less than ten (10) days prior to the proposed date of the Tag-Along Sale (the "Tag-Along Sale Date"). Each Tag-Along Sale Notice shall set forth: (i) the name and address of the Tag-Along Purchaser; (ii) the name and address of the Tag-Along Offerors; (iii) the proposed amount and form of consideration to be paid for such Units and the terms and conditions of payment offered by the Tag-Along Purchaser; (iv) the number of Units proposed to be sold or otherwise disposed of by the Tag-Along Offerors; (v) the aggregate number of Units outstanding as of the close of business on the day

immediately prior to the date of the Tag-Along Sale Notice (the "Tag-Along Notice Date"); (vi) the Tag-Along Sale Date; and (vii) any other material terms and conditions of the Tag-Along Sale. The Tag-Along Sale Notice shall further state that the Tag-Along Member may sell all of its Tag-Along Allotment for the price and upon the terms set forth therein in accordance with the provisions of this Agreement subject to the Tag-Along Member's payment of its pro rata portion of the expenses associated with such Tag-Along Sale. The Company will provide the Tag-Along Offerors with any information in the Company's possession that is required for the Tag-Along Offerors to provide the Tag-Along Sale Notice, and will use reasonable efforts to cooperate with the Tag-Along Offerors to facilitate the preparation and delivery of such Tag-Along Sale Notice.

(c)     **Tag-Along Notice.**

(i)     Any Tag-Along Member wishing to participate in the Tag-Along Sale shall provide written notice (the "Tag-Along Notice") to the Tag-Along Offerors and the Company within ten (10) days of the deemed receipt of the Tag-Along Sale Notice. The Tag-Along Notice shall set forth the number of Units that such Tag-Along Member elects to include in the Tag-Along Sale, which shall not exceed such Tag-Along Member's Tag-Along Allotment. In the event that the number of Units included in any Tag-Along Member's Tag-Along Notice exceeds such Tag-Along Member's Tag-Along Allotment such Tag-Along Member shall be deemed to have elected to include the maximum number of Units eligible to be included by such Tag-Along Member. The Tag-Along Notice given by any Tag-Along Member shall constitute such Tag-Along Member's binding agreement to sell the Units specified in the Tag-Along Notice on the terms and conditions applicable to the Tag-Along Sale; provided, however, that in the event that there is any material change in the terms and conditions of such Tag-Along Sale applicable to the Tag-Along Member (including any decrease in the purchase price that occurs other than pursuant to an adjustment mechanism set forth in any agreement relating to the Tag-Along Sale) after such Tag-Along Member gives its Tag-Along Notice, then, notwithstanding anything to the contrary contained in this Agreement, the Tag-Along Offerors shall provide prompt notice thereof and the Tag-Along Member shall have the right to withdraw from participation in the Tag-Along Sale with respect to all of its Units. If the Tag-Along Purchaser does not consummate the purchase of all of the Units validly requested to be included in the Tag-Along Sale by any Tag-Along Member on the same terms and conditions applicable to the Tag-Along Offerors, then the Tag-Along Offerors shall not consummate the Tag-Along Sale of any of its or their Units to such Tag-Along Purchaser, unless the Units of the Tag-Along Offerors and the Tag-Along Members to be sold are reduced or limited pro rata in proportion to the respective number of Units actually sold in any such Tag-Along Sale and all other terms and conditions of the Tag-Along Sale are the same for the Tag-Along Offerors and the Tag-Along Members. If not all of the Tag-Along Members provide notice, as required herein, of their intent to participate, then each participating Original Member (including the Tag-Along Offeror, as applicable) will be allowed to tag-along with respect to additional Units in an amount equal to their pro rata portion (based on the percentage equal to (x) the Units that they hold divided by (y) the Units held by the participating Original Members (including the Tag-Along Offerors) in the aggregate) of the portion of the aggregate Tag-Along Allotment that was not requested to be included in the Tag-Along Sale.

(ii)     If a Tag-Along Notice from any Tag-Along Member is not received by the Tag-Along Offerors in accordance with this Section 10.5, the Tag-Along Offerors shall have the right to consummate the Tag-Along Sale without the participation of such Tag-Along Member, but only on terms and conditions which are no more favorable in any material respect to those provided by the Tag-Along Offerors than as stated in the Tag-Along Sale Notice and only if such Tag-Along Sale occurs on a date within ninety (90) days of the Tag-Along Sale Date. If such Tag-Along Sale does not occur within such ninety (90) day period, the Units that were to be subject to such Tag-Along Sale thereafter shall continue to be subject to all of the restrictions contained in this Section 10.5.

(d)     **Cooperation.** Each Tag-Along Member agrees to cooperate in consummating such a sale, including by becoming a party to, executing and delivering the sales agreement and all other appropriate related agreements, certificates, instruments and other documents, delivering, at the consummation of such sale, certificates and other instruments for such Units duly endorsed for transfer, free and clear of all liens and encumbrances, and voting or consenting in favor of such transaction (to the extent a vote or consent is required) and taking any other necessary or appropriate action in furtherance thereof. The Tag-Along Offeror and each Tag-Along Member shall be severally responsible for its proportionate share of the reasonable third-party expenses of sale actually incurred by the Tag-Along Offerors in connection with such sale, and the monetary obligations and liabilities incurred by the sellers in connection with such sale, and if such sale is consummated, such expenses, obligations and liabilities (if any), shall be satisfied from the sale proceeds. Such monetary obligations and liabilities shall include (to the extent such obligations are incurred) obligations and liabilities for indemnification (including for breaches of representations and warranties made in connection with such sale by the Company or any other seller with respect to the Company or the Company's business and breaches of covenants in effect prior to closing), and shall also include amounts paid into escrow or subject to holdbacks, and amounts subject to post-closing purchase price adjustments; provided, however, all such obligations are equally applicable on a several and not joint basis to each Tag-Along Member based on the consideration received by such Tag-Along Member.

(e)     **No Liability.** Notwithstanding any other provision contained in this Section 10.5, there shall be no liability on the part of the Company or the Tag-Along Offerors in the event that a Tag-Along Sale pursuant to this Section 10.5 is not consummated for any reason whatsoever. The decision whether to effect a Tag-Along Sale pursuant to this Section shall be in the sole and absolute discretion of the Tag-Along Offerors.

(f)     **Coordination with Other Provisions.** The rights granted pursuant to this Section 10.5 shall be subject to the rights granted pursuant to Section 10.4 and Section 10.6.

**SECTION 10.6     Drag-Along Rights.**

(a)     **Drag-Along Sale.** If Highland ( a "Drag-Along Seller") agrees to Transfer to a third Person or group of third Persons pursuant to a bona fide offer (a "Third-Party Purchaser") in one transaction or a series of related transactions all or substantially all of its Units (a "Drag-Along Sale"), then, upon the demand of the Drag-Along Seller, all other holders of Units (the "Required Sellers") shall be required to sell to such Third-Party Purchaser a percentage of such Required Seller's Units, equal to the Drag-Along Percentage, at the same price and on the same terms and conditions (except as set forth herein), including the time of payment and the form and amount of consideration, as the Drag-Along Seller has agreed to with such Third-Party Purchaser, in accordance with this Section 10.6. The Transfer of Units by a Drag-Along Seller pursuant to this Section 10.6, or required to be Transferred by a Required Seller in the Drag-Along Sale shall be exempt from the provisions of Section 10.4. The "Drag-Along Percentage" means the quotient, expressed as a percentage, of the number of Units the Drag-Along Seller proposes to sell to the Third-Party Purchaser and the denominator of which is the total number of Units held by the Drag-Along Seller as of the close of business on the day immediately prior to the Drag-Along Notice Date.

(b)     **Drag-Along Notice.** Prior to making any Drag-Along Sale, the Drag-Along Seller shall promptly provide each Required Seller with written notice (the "Drag-Along Notice") at least ten (10) days prior to the proposed date of the Drag-Along Sale (the "Drag-Along Sale Date"). The Drag-Along Notice shall set forth: (i) the name and address of the Third-Party Purchaser; (ii) the name and address of the Drag-Along Sellers; (iii) the proposed amount and form of consideration to be paid per Unit and the terms and conditions of payment offered by the Third-Party Purchaser; (iv) the Drag-Along Percentage; (v) the number of Units held of record as of the close of business on the day immediately prior to the date of the Drag-Along Sale

Notice (the "Drag-Along Notice Date") by the Required Seller (or the escrow agent) to whom the notice is sent; (vi) confirmation that the Drag-Along Seller is selling all or substantially all of its Units to the Third-Party Purchaser; (vii) the Drag-Along Sale Date; and (viii) any other material terms and conditions of the Drag-Along Sale. The Drag-Along Sale Notice shall further state that, without any action or consent by such Required Seller, the Drag-Along Seller may sell the Drag-Along Percentage of the Required Sellers' Units for the price and upon the terms set forth therein in accordance with the provisions of this Agreement. The Drag-Along Notice shall be deemed to be given when mailed to the address for such Required Seller that is set forth on the Company's books. The Company will provide the Drag-Along Seller with any information in the Company's possession that is required for the Drag-Along Seller to provide the Drag-Along Notice, and will reasonably cooperate with the Drag-Along Seller to facilitate the preparation and delivery of such Drag-Along Notice.

(c)        **Cooperation.** Each Required Seller agrees to cooperate in consummating such a sale, including by becoming a party to, executing and delivering the sales agreement and all other appropriate related agreements, certificates, instruments and other documents, delivering, at the consummation of such sale, certificates and other instruments for such Units duly endorsed for transfer, free and clear of all liens and encumbrances, and voting or consenting in favor of such transaction (to the extent a vote or consent is required) and taking any other necessary or appropriate action in furtherance thereof. The foregoing notwithstanding, in connection with such sale, a Required Seller, as such, shall not be required to make any representations and warranties with respect to the Company or the Company's business or with respect to any other seller. In addition, the Drag-Along Seller and each Required Seller shall be severally responsible for its proportionate share of the reasonable third-party expenses of such sale actually incurred by the Drag-Along Seller in connection with such sale, and if such sale is consummated, such expenses, obligations and liabilities (if any), shall be satisfied from the sale proceeds. Such monetary obligations and liabilities shall include (to the extent such obligations are incurred) obligations and liabilities for indemnification (including for breaches of representations and warranties made in connection with such sale by the Company or any other seller with respect to the Company or the Company's business and breaches of covenants in effect prior to closing), and shall also include amounts paid into escrow or subject to holdbacks, and amounts subject to post-closing purchase price adjustments; provided, however, all such obligations are equally applicable on a several and not joint basis to the Drag-Along Seller and each Required Seller based on the consideration received by the Drag-Along Seller and such Required Seller. The foregoing notwithstanding, (i) without the written consent of a Required Seller, the amount of such obligations and liabilities for which such Required Seller shall be responsible shall not exceed the gross proceeds received by such Required Seller in such sale, (ii) a Required Seller shall not be obligated to enter into any non-compete or other post-closing covenant that restricts its activities in any way and (iii) a Required Seller shall not be responsible for the fraud of any other seller Required Seller or any indemnification obligations and liabilities for breaches of representations and warranties made by any other Required Seller with respect to such other Required Seller's (w) ownership of and title to the Units, (x) organization, (y) authority and (z) conflicts and consents.

(d)        **No Liability.** Notwithstanding any other provision contained in this Section 10.6, there shall be no liability on the part of the Company or the Drag-Along Seller in the event that the Drag-Along Sale pursuant to this Section 10.6 is not consummated for any reason whatsoever. The decision whether to effect a Drag-Along Sale pursuant to this Section 10.6 shall be in the sole and absolute discretion of the Drag-Along Seller.

(e)        **Coordination with Other Provisions.** The rights granted pursuant to this Section 10.6 shall take precedence over the rights granted pursuant to Section 10.4 and Section 10.5.

**SECTION 10.7    Future Unit Offering.**

(a)    **Preemptive Rights.** In the event the Company shall sell any Units or other series or class of ownership interests or any Unit Equivalent, each Original Member shall have the preemptive right, for as long as such Original Member and its Affiliates beneficially owns 33 1/3% of the outstanding Common Stock, to subscribe, pro rata, to their percentage ownership of Units immediately prior to any such sale, to such Units on the same terms and conditions as the Units are being offered and sold, with any subscription being conditioned upon the actual sale of Units; provided, however, that this preemptive right shall not extend to Units if the Units are to be (i) issued by the Company to effect a merger or consolidation, (ii) issued, offered, or subjected to rights or options for consideration other than cash, or (iii) issued pursuant to the Restricted Unit Plan or any other employee Unit or option plan, employee Unit purchase plans or other employee benefit plans, which plans are approved by the Management Committee and the Original Members. Written notice (the "Future Equity Sale Notice") specifying the contemplated date the new Units or the Unit Equivalent are to be sold and the offering terms thereof shall be given to each Original Member no later than thirty (30) days or earlier than sixty (60) days prior to such contemplated sale date, and each shall inform the Company of their respective intentions as to the exercise of the preemptive right provided hereunder, within ten (10) days of the date of such Future Equity Sale Notice (which shall be the date which such notice is postmarked). If no written reply is received by the Company prior to the tenth (10th) day the date of the Future Equity Sale Notice, the Company may treat the preemptive right of the non-responding party to have been waived for that, but only for that, transaction; provided, however, the referenced sale must take place no later than thirty (30) days after the contemplated sale date specified in such notice. If the contemplated sale does not take place within thirty (30) days after the contemplated sale date, then the preemptive rights under this Section 10.7(a) shall be reinstated and the Company shall comply with each of the requirements herein prior to consummating any such contemplated sale.

(b)    **Sufficient Units.** The Company covenants that prior to the sending of the notice of proposed sale to the Original Members pursuant to this Section 10.7, the Company will have sufficient authorized and unissued Units to meet all possible preemptive requests as may be forthcoming based on such notice.

**SECTION 10.8    Transfers in Compliance with Law; Substitution of Transferee.** Notwithstanding any other provision of this Agreement, the Units may not be transferred, unless (a) the transferee has agreed in writing to be bound by the terms and conditions of this Agreement pursuant to an executed Joinder Agreement, (b) the Transfer complies in all respects with the applicable provisions of this Agreement, and (c) the Transfer complies in all respects with applicable federal and state securities laws, including, without limitation, the Securities Act. Upon becoming a party to this Agreement, except as otherwise set forth in this Agreement, the Permitted Transferee of a Member shall be substituted for, and shall enjoy the same rights and be subject to the same obligations as a Member hereunder; it being understood that the rights specified in this Agreement with respect to the Original Members shall only belong to the Original Members.

**SECTION 10.9    Purported Holder.** Any purported holder of Units acquired in violation of this Article X shall be deemed to have acted as agent on behalf of the Company in acquiring such Units and shall be deemed to hold such Units in trust and on behalf and for the benefit of the Company, and the holder's purported interest in such Units shall be void *ab initio*. The purported holder shall have no right to receive distributions or other payments with respect to such Units and shall have no right to vote such Units (and for purposes of the determination of any quorum at any meeting of Members such Units shall not be considered entitled to vote on any matter). If the Management Committee shall at any time determines that a Transfer has purported to have taken place that falls within the restrictions of this Section 10.9 or that a Person intends to acquire direct or indirect legal or beneficial ownership of any Units of the Company that will result in a

violation of this Article X, the Company shall take such action as the Management Committee shall deem advisable to refuse to give effect to or to prevent such Transfer, including, but not limited to, refusing to give effect to such Transfer on the books of the Company, or instituting proceedings, at the Company's expense, to enjoin such purported Transfer.

**SECTION 10.10   Notice.** Any Member shall notify the Company (and the Company shall thereafter promptly notify the Management Committee) prior to the closing date of any transaction or proposed transaction of which such Member is a party or is proposed to be a party involving the Transfer of an interest in Unit(s) in accordance with this Agreement.

**SECTION 10.11   Rights of Unadmitted Assignees.** A Person who acquires Units but who is not admitted as a substituted Member pursuant to Section 10.8 shall be entitled only to allocations and distributions with respect to such Units in accordance with this Agreement, and shall have no right to any information or accounting of the affairs of the Company, shall not be entitled to inspect the books or records of the Company, and shall not have any of the rights of a Member under the Act or this Agreement.

**SECTION 10.12   Representations Regarding Transfers; Legend.**

(a)        Each Member hereby covenants and agrees with the Company for the benefit of the Company and all Members, that (i) it is not currently making a market in Units and will not in the future make a market in Units, (ii) it will not Transfer its Units on an established securities market, a secondary market (or the substantial equivalent thereof) within the meaning of Code Section 7704(b) (and any Regulations, proposed Regulations, revenue rulings, or other official pronouncements of the Internal Revenue Service or Treasury Department that may be promulgated or published thereunder), and (iii) in the event such Regulations, revenue rulings, or other pronouncements treat any or all arrangements that facilitate the selling of Company interests and that are commonly referred to as "matching services" as being a secondary market or substantial equivalent thereof, it will not Transfer any Units through a matching service that is not approved in advance by the Company. Each Member further agrees that it will not Transfer any Units to any Person unless such Person agrees to be bound by this Section 10.12(a) and to Transfer such Units only to Persons who agree to be similarly bound.

(b)        Each Member hereby represents and warrants to the Company and the Members that such Member's acquisition of Units hereunder is made as principal for such Member's own account and not for resale or distribution of such Units. Each Member further hereby agrees that the following legend may be placed upon any counterpart of this Agreement, the Certificate (if any), or any other document or instrument evidencing ownership of Units:

THE SECURITIES REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), OR THE SECURITIES LAWS OF ANY STATE. THE SECURITIES MAY NOT BE TRANSFERRED EXCEPT PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER SUCH ACT AND APPLICABLE STATE SECURITIES LAWS OR PURSUANT TO AN APPLICABLE EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF SUCH ACT AND SUCH LAWS.

THE COMPANY MAY REQUEST A WRITTEN OPINION OF COUNSEL (WHICH OPINION AND COUNSEL SHALL BE REASONABLY SATISFACTORY TO THE COMPANY) TO THE EFFECT THAT REGISTRATION IS NOT REQUIRED IN CONNECTION WITH AN OFFER, SALE OR TRANSFER OF THE SECURITIES REPRESENTED BY THIS CERTIFICATE.

THE SECURITIES REPRESENTED BY THIS CERTIFICATE ARE ALSO SUBJECT TO ADDITIONAL RESTRICTIONS ON TRANSFER AND VOTING AS SET FORTH IN THE OPERATING AGREEMENT, DATED JUNE 21, 2007, AMONG THE MEMBERS NAMED THEREIN, A COPY OF WHICH MAY BE INSPECTED AT THE COMPANY'S PRINCIPAL OFFICE. THE COMPANY WILL NOT REGISTER THE TRANSFER OF SUCH SECURITIES ON THE BOOKS OF THE COMPANY UNLESS AND UNTIL THE TRANSFER HAS BEEN MADE IN COMPLIANCE WITH THE TERMS OF THE OPERATING AGREEMENT.

**SECTION 10.13   Community Property.**

(a)   **Member Repurchase Option.** Each Member agrees to notify the Company in writing promptly, and in any event not later than ten (10) days after the occurrence of a Community Property Event. Subject to the limitations of applicable law, upon the occurrence of a Community Property Event, the relevant Member shall have an option to purchase all of the Units that such Member's spouse (the "CP Spouse") received as a result of the Community Property Event (the "CP Interest"). Such Member may purchase the CP Interest from his/her spouse for the Capital Account balance of such CP Interest (the "CP Purchase Price") at any time after the Community Property Event by giving his/her spouse written notice of his/her option to purchase the CP Interest; provided, however, if such Member does not exercise his/her right to purchase the CP Interest within sixty (60) days after the Community Property Event, the Company shall immediately have an option to purchase the CP Interest on the terms set forth in Section 10.13(b).

(b)   **Company Repurchase Option.** If the relevant Member fails to purchase the CP Interest as provided in Section 10.13(a), the Company may require, by giving an irrevocable written notice to any CP Spouse that such CP Spouse sell all of the CP Interest to the Company for the CP Purchase Price. The written notice shall state that the Company is exercising its option to purchase the CP Interest and set forth the date of such notice. Any CP Interest not acquired pursuant to this Section 10.13 shall remain subject to all of the provisions of this Agreement, and the Company shall have the right to purchase such CP Interest at any time in the future pursuant to Section 10.13(b).

(c)   **Closing of Purchase.** Any purchase pursuant to this Section 10.13 shall be made not later than the later of (i) thirty (30) days after the request under Section 10.13(a) or Section 10.13(b) has been given or (ii) fifteen (15) days after determination of the CP Purchase Price. The CP Purchase Price shall be paid in cash in immediately available funds, or, if approved by the Company in its sole discretion, with a five (5) year note, with equal annual installments, bearing interest at the prime rate on the date of the purchase. Upon payment of the CP Purchase Price, the CP Spouse shall Transfer the CP Interest free and clear of any and all encumbrances of any kind whatsoever other than those created by this Agreement, the Company or any other Members.

(d)   **Spousal Acknowledgements.** Any spouse of a Member who obtains Units pursuant to a Community Property Event shall be treated as an assignee, shall not be admitted to the Company as a substitute Member, and shall not have the management rights and/or approval rights, as appropriate, of a Member under this Agreement, including the right to vote on Company actions or propose or approve Company actions. Generally, the provisions of Section 10.11 shall control the rights of a party who succeeds to all or part of the economic interest in the Company of a Member. Furthermore, by signing the spouse's agreement set forth on Exhibit D, each spouse of a Member agrees to be bound by the terms of this Agreement.

**SECTION 10.14   Buy-Sell on Deadlock.**

(a)   **Offer.** In the event that a Deadlock occurs, then any Original Member (the "Offering Member") (other than a Bankrupt Member or a Member in default hereunder), after giving the

other Original Members notice of Deadlock and a fifteen (15)-day period within which the Managers and/or Original Members, as applicable, may endeavor to resolve such Deadlock (the "Deadlock Period"), may, if such Deadlock continues to exist, make a written offer to the other Original Member (the "Offeree Member") to either buy all of the Units of the Offeree Member or to sell all of the Offering Member's Units to the Offeree Member. An offer pursuant to a Deadlock shall be referred to herein as an "Offer." The Offer may be made at any time within thirty (30) days after the expiration of the Deadlock Period. The Offer submitted by the Offering Member to the Offeree Member shall state the purchase price (expressed in dollars per Unit) at which the Offering Member will be willing either to purchase from the Offeree Member all of the Units of the Offeree Member or to sell to the Offeree Member all of the Offering Member's Units. In either case (i.e., as applied to a purchase or sale), the purchase price per Unit shall be the same.

      (b)    **Acceptance.** The Offeree Member shall, within thirty (30) days after the Offer described in this Section 10.14 is received, elect either to sell all of its Units to the Offering Member or to purchase all of the Offering Member's Units at the purchase price per Unit stipulated in that Offer. Such election shall be made in writing and notice thereof shall be sent to the Offering Member within said thirty (30)-day period. In the event the Offeree Member shall fail to make such election and notify the Offering Member within said thirty (30)-day period, the Offeree Member shall be deemed to have elected to sell all of its Units to the Offering Member at the purchase price per Unit specified in the Offering Member's notice. For the purposes of the remainder of this Section 10.14, the Member obligated to sell his Units pursuant to the foregoing provisions is hereinafter referred to as the "Tendering Member," and the Member obligated to purchase such Units, is hereinafter referred to as the "Purchasing Member." The closing of the purchase and sale shall take place within sixty (60) days following the expiration of the aforesaid thirty (30)-day period on the date and at the time and place specified by the Purchasing Member by written notice to the Tendering Member. The stipulated purchase price shall be payable in cash at closing. If the Purchasing Member does not remit the purchase price to the Tendering Member in cash within the sixty(60)-day period, and all other conditions to the closing of the purchase and sale have otherwise been satisfied or waived (other than delivery of items to be delivered at closing and other than satisfaction of those conditions that by their nature are to be satisfied at the closing) the Tendering Member shall have an option to purchase all of the Purchasing Member's Units for seventy-five percent (75%) of the purchase price stated in the original Offer (provided that right to reduce the purchase price as provided herein shall not be available to any party whose action or failure to act has been a principal cause of or resulted in the failure of the purchase and sale within such sixty (60)-day period). To the extent a Tendering Member has any liabilities or obligations of or to the Company or the Purchasing Member pursuant to this Agreement, the purchase price shall be reduced by the amount of such liabilities and obligations and the sale of the Units of the Tendering Member shall be subject to all liabilities and obligations of the Company and, at the closing, the Purchasing Member shall assume the Tendering Member's share of all such liabilities and obligations as of the closing date. To the extent the purchase price is reduced to a negative value as a result of such liabilities and obligations, the Tendering Member shall pay to the Purchasing Member an amount in cash equal to the amount (expressed in absolute values) the purchase price is reduced below $0.00.

      (c)    **Closing.** At the closing, the Tendering Member shall deliver to the Purchasing Member unencumbered Units by an executed assignment of the Tendering Member's Units, together with a warranty bill of sale covering those Units and any other interest in the Company assets, and shall take all actions elsewhere described in this Agreement under the circumstance of termination of a Member's interest in the Company. The Tendering Member, by execution of this Agreement or any counterpart thereof, does hereby irrevocably nominate, constitute and appoint each of the Purchasing Members as his true and lawful attorney-in-fact, with full power and authority, in the Tendering Member's name, place and stead to make, execute, acknowledge, swear to, deliver, file and record any or all of the foregoing documents or instruments, and to give notice to creditors and others dealing with the Company of the termination of the Tendering Member's interest in the Company and to publish notice of the termination of the Tendering Member's

interest in the Company, all in the event the Tendering Member fails or refuses promptly to do so. The foregoing power of attorney, being coupled with an interest, is hereby declared irrevocable and shall survive the death, dissolution or incapacity of the Tendering Member.

## ARTICLE XI
## DISSOLUTION AND WINDING UP

**SECTION 11.1    Dissolution Events.**

(a)    **Dissolution.** The Company shall dissolve and shall commence winding up and liquidating upon the first to occur of any of the following (each a "Dissolution Event"):

(i)    The vote of all the Original Members to dissolve, wind up, and liquidate the Company;

(ii)    A judicial determination that an event has occurred that makes it unlawful, impossible, or impractical to carry on the Business; or

(iii)    The Bankruptcy, dissolution, retirement, resignation, or expulsion of any Original Member, provided, however, any such event will not be deemed a Dissolution Event in the event that there are at least two remaining Members and each remaining Member agrees to continue the business of the Company within ninety (90) days after the occurrence of such an event.

The Members hereby agree that, notwithstanding any provision of the Act, the Company shall not dissolve prior to the occurrence of a Dissolution Event.

(b)    **Reconstitution.** If it is determined, by a court of competent jurisdiction, that the Company has dissolved prior to the occurrence of a Dissolution Event, then within an additional ninety (90) days after such determination (the "Reconstitution Period"), all of the Members may elect to reconstitute the Company and continue its business on the same terms and conditions set forth in this Agreement by forming a new limited liability company on terms identical to those set forth in this Agreement. Unless such an election is made within the Reconstitution Period, the Company shall liquidate and wind up its affairs in accordance with Section 11.2. If such an election is made within the Reconstitution Period, then:

(i)    The reconstituted limited liability company shall continue until the occurrence of a Dissolution Event as provided in Section 11.1(a);

(ii)    Unless otherwise agreed to by a majority of the Members, the Certificate and this Agreement shall automatically constitute the Certificate and Agreement of such new Company. All of the assets and liabilities of the dissolved Company shall be deemed to have been automatically assigned, assumed, conveyed and transferred to the new Company. No bond, collateral, assumption, or release of any Member's or the Company's liabilities shall be required; provided, however, the right of the Members to select successor managers and to reconstitute and continue the Business shall not exist and may not be exercised unless the Company has received an opinion of counsel that the exercise of the right would not result in the loss of limited liability of any Member and neither the Company nor the reconstituted limited liability company would cease to be treated as a partnership for federal income tax purposes upon the exercise of such right to continue.

**SECTION 11.2    Winding Up.** Upon the occurrence of (i) a Dissolution Event or (ii) the determination by a court of competent jurisdiction that the Company has dissolved prior to the occurrence of a Dissolution Event (unless the Company is reconstituted pursuant to Section 11.1(b)), the Company shall

continue solely for the purposes of winding up its affairs in an orderly manner, liquidating its assets, and satisfying the claims of its creditors and Members, and no Member shall take any action that is inconsistent with, or not necessary to or appropriate for, the winding up of the Company's business and affairs; provided, however, all covenants contained in this Agreement and obligations provided for in this Agreement shall continue to be fully binding upon the Members until such time as the Property has been distributed pursuant to this Section 11.2 and the Certificate has been canceled pursuant to the Act. The Liquidator shall be responsible for overseeing the winding up and dissolution of the Company, which winding up and dissolution shall be completed within ninety (90) days of the occurrence of the Dissolution Event and within ninety (90) days after the last day on which the Company may be reconstituted pursuant to Section 11.1(b). The Liquidator shall take full account of the Company's liabilities and Property and shall cause the Property or the proceeds from the sale thereof (as determined pursuant to Section 11.9), to the extent sufficient therefor, to be applied and distributed, to the maximum extent permitted by law, in the following order:

(a)     First, to creditors (including Members and Managers who are creditors, to the extent otherwise permitted by law) in satisfaction of all of the Company's Debts and other liabilities (whether by payment or the making of reasonable provision for payment thereof), other than liabilities for which reasonable provision for payment has been made and liabilities for distribution to members under Section 18-601 or Section 18-604 of the Act;

(b)     Second, except as provided in this Agreement, to members and former Members of the Company in satisfaction of liabilities for distribution under Section 18-601 or Section 18-604 of the Act; and

(c)     The balance, if any, to the Members in accordance with the positive balance in their Capital Accounts, after giving effect to all contributions, distributions and allocations for all periods.

No Member or Manager shall receive additional compensation for any services performed pursuant to this Article XI.

**SECTION 11.3     Rights of Members.** Except as otherwise provided in this Agreement, each Member shall look solely to the Property of the Company for the return of its Capital Contribution and has no right or power to demand or receive Property other than cash from the Company. If the assets of the Company remaining after payment or discharge of the debts or liabilities of the Company are insufficient to return such Capital Contribution, the Members shall have no recourse against the Company or any other Member or Manager.

**SECTION 11.4     Notice of Dissolution/Termination.**

(a)     In the event a Dissolution Event occurs or an event occurs that would, but for provisions of Section 11.1, result in a dissolution of the Company, the Management Committee shall, within thirty (30) days thereafter, provide written notice thereof to each of the Members and to all other parties with whom the Company regularly conducts business (as determined in the discretion of the Management Committee) and shall publish notice thereof in a newspaper of general circulation in each place in which the Company regularly conducts business (as determined in the discretion of the Management Committee).

(b)     Upon completion of the distribution of the Company's Property as provided in this Article XI, the Company shall be terminated, and the Liquidator shall cause the filing of the Certificate of Cancellation pursuant to Section 18-203 of the Act and shall take all such other actions as may be necessary to terminate the Company.

**SECTION 11.5    The Liquidator.**

(a)    **Definition.** The "Liquidator" shall mean a Person appointed by the Management Committee to oversee the liquidation of the Company.

(b)    **Fees.** The Company is authorized to pay a reasonable fee to the Liquidator for its services performed pursuant to this Article XI and to reimburse the Liquidator for its reasonable costs and expenses incurred in performing those services.

(c)    **Indemnification.** The Company shall indemnify, save harmless, and pay all judgments and claims against such Liquidator or any officers, directors, agents, or employees of the Liquidator relating to any liability or damage incurred by reason of any act performed or omitted to be performed by the Liquidator, or any officers, directors, agents, or employees of the Liquidator in connection with the liquidation of the Company, including reasonable attorneys' fees incurred by the Liquidator, officer, director, agent, or employee in connection with the defense of any action based on any such act or omission, which attorneys' fees may be paid as incurred, except to the extent such liability or damage is caused by the fraud, intentional misconduct of, or a knowing violation of the laws by the Liquidator that was material to the cause of action.

**SECTION 11.6    Form of Liquidating Distributions.** For purposes of making distributions required by Section 11.2, the Liquidator may determine whether to distribute all or any portion of the Property in-kind or to sell all or any portion of the Property and distribute the proceeds therefrom.

## ARTICLE XII
## POWER OF ATTORNEY

**SECTION 12.1    Managers As Attorneys-In-Fact.** Each Member hereby makes, constitutes, and appoints each Manager, severally, with full power of substitution and resubstitution, its true and lawful attorney-in-fact for it and in its name, place, and stead and for its use and benefit, to sign, execute, certify, acknowledge, swear to, file, publish, and record (i) all certificates of formation, amended name or similar certificates, and other certificates and instruments (including counterparts of this Agreement) that the Management Committee may deem necessary to be filed by the Company under the laws of the State of Delaware or any other jurisdiction in which the Company is doing or intends to do business, (ii) any and all amendments, restatements, or changes to this Agreement and the instruments described in clause (i), as now or hereafter amended, which the Management Committee may deem necessary to effect a change or modification of the Company in accordance with the terms of this Agreement, including, without limitation, amendments, restatements, or changes to reflect (A) any amendments adopted by the Members in accordance with the terms of this Agreement, (B) the admission of any substituted Member, and (C) the disposition by any Member of its interest in the Company, (iii) all certificates of cancellation and other instruments that the Management Committee deems necessary or appropriate to effect the dissolution and termination of the Company pursuant to the terms of this Agreement, and (iv) any other instrument that is now or may hereafter be required by law to be filed on behalf of the Company or is deemed necessary by the Management Committee to carry out fully the provisions of this Agreement in accordance with its terms. Each Member authorizes each such attorney-in-fact to take any further action that such attorney-in-fact shall consider necessary in connection with any of the foregoing, hereby giving each such attorney-in-fact full power and authority to do and perform each and every act or thing whatsoever requisite to be done in connection with the foregoing as fully as such Member might or could do personally, and hereby ratify and confirm all that any such attorney-in-fact shall lawfully do, or cause to be done, by virtue thereof or hereof.

**SECTION 12.2    Nature of Special Power.**  The power of attorney granted to each Manager pursuant to this Article XII:

(a)     Is a special power of attorney coupled with an interest and is irrevocable;

(b)     May be exercised by any such attorney-in-fact by listing the Members executing any agreement, certificate, instrument, or other document with the single signature of any such attorney-in-fact acting as attorney-in-fact for such Members; and

(c)     Shall survive and not be affected by the subsequent Bankruptcy, insolvency, dissolution, or cessation of existence of a Member and shall survive the delivery of an assignment by a Member of the whole or a portion of its interest in the Company (except that where the assignment is of such Member's entire interest in the Company and the assignee, with the consent of the other Members, is admitted as a substituted Member, the power of attorney shall survive the delivery of such assignment for the sole purpose of enabling any such attorney-in-fact to effect such substitution) and shall extend to such Member's or assignee's successors and assigns.

## ARTICLE XIII
## MISCELLANEOUS

**SECTION 13.1    Notices.**  Any notice, payment, demand, or communication required or permitted to be given by any provision of this Agreement shall be in writing and shall be deemed to have been delivered, given, and received for all purposes (i) if delivered personally to the Person or to an officer of the Person to whom the same is directed or (ii) when the same is actually received, if sent either by registered or certified mail, postage and charges prepaid, or by facsimile, if such facsimile is followed by a hard copy of the facsimile communication sent promptly thereafter by registered or certified mail, postage and charges prepaid, addressed as follows, or to such other address as such Person may from time to time specify by notice to the Members and Managers:

(a)     If to the Company, to the address determined pursuant to Section 1.4;

(b)     If to the Managers, to the address set forth in Exhibit C;

(c)     If to a Member, to the address set forth on the Signature Page hereof or the Signature Page of such joinder executed by a Member in the form and substance set forth in Exhibit B-1 or Exhibit B-2, as applicable.

**SECTION 13.2    Binding Effect.**  Except as otherwise provided in this Agreement, every covenant, term, and provision of this Agreement shall be binding upon and inure to the benefit of the Members and their respective successors, transferees, and assigns.  This Agreement is not assignable except in connection with a transfer of Units in accordance with this Agreement.  Any attempted assignment made in contravention of this Agreement shall be null and void and of no effect.

**SECTION 13.3    Construction.**  Every covenant, term, and provision of this Agreement shall be construed simply according to its fair meaning and not strictly for or against any Member.

**SECTION 13.4    Transferees Bound.**  All Units owned by a transferee shall, subject to the terms of Sections 10.4, 10.5, 10.6, 5.7(a) and 5.7(b), for all purposes be subject to the terms of this Agreement whether or not such transferee has executed a joinder as set forth in Exhibit B-1 or B-2 to be bound by this Agreement.

**SECTION 13.5    Time.** In computing any period of time pursuant to this Agreement, the day of the act, event, or default from which the designated period of time begins to run shall not be included, but the time shall begin to run on the next succeeding day. The last day of the period so computed shall be included, unless it is a Saturday, Sunday, or legal holiday, in which event the period shall run until the end of the next day that is not a Saturday, Sunday, or legal holiday.

**SECTION 13.6    Headings.** Section and other headings contained in this Agreement are for reference purposes only and are not intended to describe, interpret, define, or limit the scope, extent, or intent of this Agreement or any provision hereof.

**SECTION 13.7    Severability.** Except as otherwise provided in the succeeding sentence, every provision of this Agreement is intended to be severable, and, if any term or provision of this Agreement is illegal or invalid for any reason whatsoever, such illegality or invalidity shall not affect the validity or legality of the remainder of this Agreement. The preceding sentence of this Section 13.7 shall be of no force or effect if the consequence of enforcing the remainder of this Agreement without such illegal or invalid term or provision would be to cause any Member to lose the material benefit of its economic bargain.

**SECTION 13.8    Incorporation by Reference.** Every exhibit, schedule, and other appendix attached to this Agreement and referred to herein is not incorporated in this Agreement by reference unless this Agreement expressly otherwise provides.

**SECTION 13.9    Variation of Terms.** All terms and any variations thereof shall be deemed to refer to masculine, feminine, or neuter, singular or plural, as the identity of the Person or Persons may require. The words "hereof," "herein" and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement, and Section, Subsection and Schedule references are to this Agreement unless otherwise specified. The term "including" shall mean "including without limitation."

**SECTION 13.10    Governing Law.** The laws of the State of Delaware shall govern the validity of this Agreement, the construction of its terms, and the interpretation of the rights and duties arising hereunder without respect to it conflict of laws provisions.

**SECTION 13.11    Waiver of Jury Trial.** EACH PARTY HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT SUCH PARTY MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT, OR THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT. EACH PARTY CERTIFIES AND ACKNOWLEDGES THAT (i) NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER, (ii) EACH PARTY UNDERSTANDS AND HAS CONSIDERED THE IMPLICATIONS OF THIS WAIVER, (iii) EACH PARTY MAKES THE WAIVER VOLUNTARILY, AND (iv) EACH PARTY HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 13.12.

**SECTION 13.12    Counterpart Execution.** This Agreement may be executed in any number of counterparts with the same effect as if all of the Members had signed the same document. All counterparts shall be construed together and shall constitute one agreement.

**SECTION 13.13    Specific Performance.** Each Member agrees with the other Members that the other Members would be irreparably damaged if any of the provisions of this Agreement are not performed in accordance with their specific terms and that monetary damages would not provide an adequate remedy in such

event. Accordingly, it is agreed that, in addition to any other remedy to which the nonbreaching Members may be entitled, at law or in equity, the nonbreaching Members shall be entitled to injunctive relief to prevent breaches of the provisions of this Agreement and specifically to enforce the terms and provisions hereof in any action instituted in any court of the United States or any state thereof having subject matter jurisdiction thereof.

SECTION 13.14  Confidentiality. Each Member agrees to treat information concerning the terms of this Agreement confidentially including all information received or obtained hereunder, except to the extent that disclosure is required by law or regulation or generally accepted accounting principles. The foregoing constraint shall not include: (i) information that is now in the public domain or subsequently enters the public domain without fault on the part of the disclosing party; (ii) information currently known to the disclosing party from its own sources as evidenced by its prior written records; (iii) information that the disclosing party receives from a third party not under any obligation to keep such information confidential; (iv) disclosure made to Affiliates or the professional advisors of the disclosing party for the purpose of obtaining advice thereon; (v) disclosure made in connection with the enforcement of any right or the fulfillment of any obligation pursuant hereto; (vi) disclosure made in response to government subpoena; and (vii) disclosure made to a proposed transferee of any Member and any counsel of the foregoing respecting the transactions contemplated by this Agreement; provided, however,  any proposed transferee agrees in writing to be bound by the restrictions in this Section 13.14 prior to disclosure thereto of such information.

*Remainder of Page Intentionally Left Blank.*
*Signature Page(s) Follow.*